Reversed and remanded for a new trial.

54 A.3d 293

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. L.J.D., DEFENDANT–APPELLANT.

IN THE MATTER OF THE GUARDIANSHIP OF A.T.D., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued September 25, 2012—Decided October 17, 2012.

452

Before Judges MESSANO, LIHOTZ and OSTRER.

*Michael S. Harwin,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney; *John A. Salois,* Designated Counsel, on the brief).

*Kendra Andrews,* Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Andrews,* on the brief).

*Damen J. Thiel,* Designated Counsel, argued the cause for minor A.T.D. (*Joseph E. Krakora,* Public Defender, Law Guardian, attorney; *Mr. Thiel,* on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

We examine a young mother's challenges to a judgment of guardianship terminating her parental rights. Defendant L.J.D. (whom we refer to as "Lela") was fourteen when her son, A.T.D. (whom we refer to as "Alvin") was born. At that time, Lela herself was a child, who was placed in the custody and care of plaintiff, the Division of Youth and Family Services, now known as the Division of Child Protection and Permanency (the Division).[1] As a result of Lela's custodial status, the Division assumed custody of Alvin at birth. After extending services to Lela over the ensuing years, the Division concluded she was not able to provide safe and stable care for Alvin. Consequently, the Division filed a complaint seeking guardianship and the termination of parental rights for the purpose of consenting to Alvin's adoption. Lela appeals from the judgment entered on June 27, 2011,[2] challenging

---

[1] On June 29, 2012, the Governor signed into law A–3101, which reorganizes the Department of Children and Families, which includes the renaming of the Division as the Division of Child Protection and Permanency. *L.* 2012, *c.* 16, eff. June 29, 2012 (amending *N.J.S.A.* 9:3A–10b).

[2] The judgment also terminated the parental rights of Alvin's father, J.F., who has not filed an appeal.

the trial judge's findings underpinning his conclusion to terminate her parental rights. She principally argues she never harmed Alvin and the Division failed to make reasonable efforts to provide her available services, which would have helped correct circumstances that led to Alvin's placement with a resource family.

After reviewing the record and applicable law in light of the arguments advanced on appeal, we uphold the trial court's findings that clear and convincing credible evidence satisfied the four statutory prongs necessary for termination of a parent's rights. Accordingly, the award of guardianship predicated on those findings is legally sound and must be affirmed. *N.J. Div. of Youth & Family Servs. v. A.R.G.*, 361 *N.J.Super.* 46, 78, 824 *A.*2d 213 (App.Div.2003), *aff'd in part, modified in part,* 179 *N.J.* 264, 845 *A.*2d 106 (2004).

## I.

The unique nature of the circumstances presented requires a comprehensive recitation of the facts leading to the Division's filing for guardianship, which are not disputed.

In May 2008, Lela was placed in the care and custody of the Division following allegations of "neglect, sexual abuse, [and] physical abuse," perpetrated by her psychiatrically impaired mother and her mother's paramour. The Division had intervened the prior year and extended counseling to Lela. A June 11, 2007 psychiatric evaluation, performed by Alexander Iofin, M.D., noted Lela admitted she had "a history of fire setting," "suicidal ideation," marijuana use, occasional underage drinking, juvenile delinquent conduct, and uncontrolled anger. Lela also confirmed she suffered flashbacks of being raped and "some type of auditory, as well as visual hallucinations[.]"

Lela was sexually active and the Division learned she was pregnant. The Division continued Lela's individual counseling and added prenatal support and parenting skills instruction. The Division also took steps to secure custody of Lela's baby. When Alvin was born, the Division imposed a hold preventing Alvin's

discharge from the hospital and sought a court order for his placement. On May 13, 2008, a Family Part judge found Lela could not "independently provide for herself or her son as she d[id] not have financial stability, housing, or medical insurance" and temporarily awarded the Division custody, care and supervision of Alvin. Lela lived with her adult sister and Alvin was placed in a foster home pending the Division's identification of a joint placement for Lela and Alvin. In preparation for this placement, Lela and Alvin enjoyed weekly visitation and later were permitted to spend weekends together in the home of and supervised by Lela's sister.

In July 2008, Lela and Alvin were placed in the Union Industrial Home Family Partners "Mommy & Me" program (UIH), a residential home for teen mothers and their babies. Lela had completed a psychological evaluation and was directed to engage in individual counseling. The weekend visits supervised by Lela's sister continued with the added assistance of a home health care aid to instruct Lela on the safe and necessary care of her son.

On October 1, 2008, UIH terminated Lela's program participation as a result of her "defiant, non-compliant behavior and her willingness to leave the program[.]" While some of the identified issues were likely the result of Lela's inexperience and uncertainty in mothering (e.g., a difficulty in administering medication), other conduct, such as "[r]efusing to listen to staff's directions[,]" "crank[ing] up her radio to drown [out]" staff instructions, "verbally threaten[ing] both staff and residents," "verbally and physically aggressive [conduct toward] peers and staff[,]" and "[r]efusing to follow house rules[,]" resulted because of Lela's unwillingness to comply with the program's requirements. UIH's program director recommended Lela needed "intensive counseling" and "anger management" and concluded she was not "capable of caring for her son."

Lela returned to live with her sister. Alvin was placed with a resource family, who currently provides his care. The resource

family has expressed its interest in pursuing adoption, if permitted.

The Division referred Lela to additional programs to teach her the necessities of parenting. Instruction by Babyland Family Services, Inc. and development of a comprehensive care plan by Innovative Specialists Inspirational Services, L.L.C. (ISIS) set specific skill goals for Lela through in-home therapy and group anger management counseling. Lela completed Babyland's parenting program and was cooperative with the ISIS social worker. The Division's reunification efforts continued, as it coordinated in-home therapy, visitation, life skills instruction, and intensive one-on-one parenting classes for Lela.

On May 9, 2009, Lela's sister called the Division, requesting Lela's removal from her residence. An argument had erupted between the siblings, during which Lela punched, hit, and scratched her sister, then grabbed a pair of scissors and threatened to kill her. Lela's sister called the police and the Division when Lela refused to drop the scissors. Her sister also reported Lela was "skipping school" and neglecting to take prescribed medication for bi-polar disorder. The Division discovered Lela had missed many days of school; some were to attend court hearings, but others were unexplained. On May 14, 2009, she was suspended for two days and missed the entire week after being removed from her sister's home.

Lela was placed in the Newark YMWCA shelter program and directed to undergo anger management and individual therapy. Before month's end, Lela engaged in a physical altercation with another YMWCA resident and was asked to leave. The Division placed Lela in a foster home and scheduled another psychological evaluation, this time with Dr. Leslie A. Trott, Ed.D.

Dr. Trott noted Lela was "quite psychologically distressed" and difficult to manage during the assessment. She appeared confrontational, "unruly, loud[,] and belligerent." She appeared "agitated and impulsive[,]" exhibited "violent, aggressive reactions," was "struggling and in need of help." Lela also reported experiencing

hallucinations, including visions of her dead grandmother and told Dr. Trott she sees spirits. Dr. Trott diagnosed Lela as suffering from mental illness, but she refused to take medication. Based upon his evaluation, Dr. Trott concluded Lela had "good cognitive potential" but struggled "to reason right from wrong and lack[ed] the potential to cognitively compose appropriate solutions to child management challenges. Her psychological distress deteriorates her common sense, causes poor judgment and diminishes her potential to parent." He concluded "[s]he should not be visiting her infant without close supervision" and suggested she "live in a residence for teens where psychiatric services are available" and "be evaluated by a psychiatrist for medications to intervene with her hallucinations and impulsive, confrontational tendencies."

On June 7, 2009, the Division received a report from Mary M. Gibbons, L.S.W., Lela's in-home therapist. Gibbons advised Lela's attendance had been "sporadic[,]" and she had "not made progress on the goals stipulated by the court-specifically the anger management issues and addressing the emotional issues related to her abusive past." Gibbons related a recent illustrative incident. Lela requested Gibbons give her "an honest answer" regarding what she was doing that jeopardized her reunification with Alvin. When Gibbons proceeded to do so, Lela "became very angry and told [Gibbons] to leave." Despite a brief delay, Lela would not calm down and repeated her demand for Gibbons to leave. Gibbons opined Lela's "current level of in-home services [wa]s not sufficient[,]" and "perhaps a more intensive day treatment program where [Lela] might receive psychiatric treatment as well as potential group and/or individual therapy would more adequately and appropriately assist her[.]"

Other information weighed against reunification of mother and son. A June 2009 visitation report from Children's Aid and Family Services, Inc. (CAFS), the agency supervising Lela's visits with Alvin and responsible for providing "hands-on parenting skills training[,]" stated Lela was making little progress as a mother, and "lack[ed] the maturity and insight to care for and parent [her]

child." On July 9, 2009, Lela's resource mother telephoned the Division at 10:55 p.m. stating she had contacted the police because Lela left for summer school at 7:00 a.m. and had not returned, despite her 8:30 p.m. curfew. Lela arrived home shortly after midnight. The resource mother also revealed Lela had been "running away on and off" and was "very abrupt and nasty" with her. Based on additional reports, the Division believed Lela also had someone pretend to work for the Division, and call the resource mother to advise Lela had permission to spend time with her sister whenever she wanted.

By September 2, 2009, the court accepted the Division's proposed change in the permanency goal for Alvin: the Division intended to seek guardianship and termination of parental rights followed by Alvin's adoption. The family court judge found Lela had "not complied with ... services[,]" had "unresolved anger issues[,]" "disrupted [the] mommy and me placement, and then her relative home placement[,]" and lacked "maturity, stable housing or income to care for her child." Lela was again scheduled for individual counseling and anger management services.

The Division investigated alternative relative placements for Alvin. His paternal grandmother and Lela's cousin were ruled out. Lela's sister did not respond to the Division's repeated inquiries, and she too was ruled out when the Division learned she was homeless. Further, the Division also worked with Alvin's father, who initially expressed interest in parenting his son, but he failed to follow through and engage necessary services and visitation.

Lela was re-evaluated by Dr. Iofin on September 6, 2009. When asked, she denied experiencing hallucinations, adamantly insisting she suffered no psychiatric symptoms and claimed she had been "playing" with Dr. Trott. Dr. Iofin rejected this explanation as "highly, highly improbable," stating Lela's response needed "to be approached as a response [of a] 'street smart' person, [who knows] such disclosures will [not] be in her best interest." Dr. Iofin diagnosed Lela with impulse control disorder,

intermittent explosive disorder, opposition-defiant disorder, psychotic disorder, anxiety disorder, personality disorder, and narcissistic personality traits. He opined she was not "a reasonable candidate for reunification with her child[,]" and recommended her visits with Alvin be supervised by the Division "in a professional setting."

Although she missed her first appointment, beginning on September 9, 2009, Lela attended individual therapy focused on anger management conducted by Claire M. Forte–McRobbie, L.S.W. of Family Connections. Over the following five weeks, she attended all sessions; "present[ed] as cooperative, open, and pleasant"; "engaged actively in discussions of her problem[s]"; "actively participated in the formulation of her treatment plan"; demonstrated "good progress" in therapy; and "appear[ed] dedicated to being reunited with her son." By year's end, Lela missed a few sessions because of transportation problems, otherwise she demonstrated "some progress" in managing her anger, but continued to have "difficulty with impulse control under other circumstances, particularly in the school environment." Forte–McRobbie recommended individual therapy continue.

Lela attended individual therapy offered by Independence: A Family of Services, Inc. (IFS), which was also involved in her education. Joyce Lopez, L.C.S.W., the high school counselor, informed the Division Lela had twenty-five sessions focused on her anger and sadness given the removal of her son. Lela's motivation was to demonstrate a willingness to comply with the Division's requests and engage in a therapeutic process in anticipation of eventually reuniting with Alvin. Lopez recounted Lela's school improvement, as she exhibited no behavioral problems, had not been sent to detention, achieved perfect attendance that fall, and recently received an honor for attaining an "A" in her subjects. Lela also completed parenting skills courses and earned the relevant certificates. Lopez wrote Lela "should be commended for her determination to get her son back and for her acknowledgment that she would need help in raising him."

On January 6, 2010, the Division filed a complaint seeking guardianship of Alvin. The protective services matter was voluntarily dismissed.

At the Division's request, Rachael Ann Fite, Ph.D., performed a thorough psychological evaluation on March 8, 2010. Dr. Fite was able to eliminate the possibility of psychosis or a concern posed by past fire-starting conduct, stating it did not "appear to be currently of concern." She credited Lela's avoidance of substance abuse and acknowledged her commitment and success in school. Dr. Fite also noted Lela's improved behavior management, stating "[a]lthough not completely remediated, she has been able to substantially curb a long-term pattern of violent outbursts and physical assault of others." Dr. Fite identified Lela's modified behaviors, commitment to therapy, consistent visitation attendance, expressed love for her son, and sincere desire to be Alvin's caregiver.

However, Dr. Fite's assessment report identified several deficiencies impeding Lela's independent parenting of Alvin. Lela's statements regarding parenting were general and abstract, void of a realistic understanding of parental responsibilities. Further, when directed to discuss specific problem areas that could affect the child's safety, Lela became defensive and often minimized her responsibility, suggesting someone else was at fault. Dr. Fite noted Lela had been able to develop "a far more appropriate interaction style" but "[d]espite her obvious efforts to manage her own behavior, . . . she continues to find herself sporadically having made a significant mistake in judgment and behavior and had continued to destabilize herself in this matter." Based on her review of the visitation reports, Dr. Fite noted Lela had been

unable to engage her son adequately to allow for visits to occur without strain and discomfort on the part of the child. It is of particular concern that the visitation supervisor reported that [Alvin] consistently runs from the room at the first suggestion that the visit is over. Additionally concerning is the continued need to discuss with [Lela] that she allow the two[-]year old to be the priority instead of herself during the visit.

Evaluating the testing, the clinical interview, review of prior evaluations and assessments, and information obtained from collateral communications, Dr. Fite opined Lela "has not yet managed to achieve adequate stability or parenting skills to warrant a reasonable expectation that she could safely and appropriately care for her son ..., now or in the near future." Dr. Fite recommended the Division "consider terminating her parental rights ... releasing [Alvin] for adoption."

Lela continued therapy with Forte–McRobbie, missing only three of twenty-six sessions over six months. Lela "responded positively to the anger management and counseling treatment" showing a "strong commitment to self-improvement[,]" and her "judgment, insight, and impulse control all appear[ed] to have shown improvement."

Recent reports by CAFS informed the Division Lela remained consistent with her visitation participation and deeply loved her son. She had

> continually shown obvious love and concern for her son. She showers him with affection, makes sure he is safe ..., and is attentive in caring for his needs throughout the visit.... She often speaks of her plans for him once she can take him home. She tries to teach him things and seems to enjoy spending time with him. She has purchased several items including shoes and clothes and took pleasure and pride in presenting them to him.

However, she continued to exhibit deficits in parenting when the child was fussy or upset. Lela acted immaturely "with respect to being a self-less parent[,]" holding expectations of Alvin to entertain her and give her affection and attention that were beyond his developmental ability. Further, she could not consistently separate her own needs from his. Moreover, she was idealistic and failed to recognize "the reality of parenting despite [the] worker's attempts to educate her." The worker noted Lela

> might be able to provide adequate basic care to her son. However, the unease comes from [Lela]'s lack of understanding and knowledge of a child's physical, emotional, cognitive, and social development. Although she has taken parenting classes, this worker feels that her age and maturity level make it difficult for her to absorb much of the information. There is also concern that with the stressors inherent in everyday life and lack of familial support, [Lela] would be overwhelmed

and frustrated easily, making it extremely difficult to respond appropriately when parenting her child.

These same issues surfaced in the final evaluations procured by the Division. On October 20, 2010, Mark Singer, Ed.D., was engaged to perform an evaluation of Lela's "parenting ability, mental status, and treatment needs." Also, he performed a bonding evaluation of Lela and Alvin and a bonding evaluation between Alvin and his resource parents.

Dr. Singer concluded Alvin had formed multiple attachments viewing "his caregivers and his mother as being significant parental figures in his life. The child appears, at least on an intellectual level, to recognize that he has 2, 'mommies,' and a 'daddy.'" Difficulties were observed in Lela's ability to provide structure for the child; she seemed unable to grasp his developmental abilities, for example, when he resisted her directions regarding play and affection. Dr. Singer found Alvin "may have, to some degree, distanced himself from his mother" as a result of being separated from her. Dr. Singer concluded:

> While there are clearly concerns regarding [Lela]'s ability to provide an appropriate environment for her child, and while the data does clearly indicate that, within a reasonable degree of psychological certainty, [Lela] lacks the skills and resources needed to care for any child independently at this point in time, the data does also suggest that, with appropriate continued intervention, [Lela] may become a viable parenting option for her son in the foreseeable future.

Dr. Singer specifically recommended Lela be placed in a highly structured "Mommy & Me" program, to which Alvin would be transitioned with Lela under supervised care. Dr. Singer cautioned that another removal after reuniting with Lela would increase the risk Alvin would suffer "enduring harm[.]"

Overall, Dr. Singer determined Alvin would likely have a greater reaction to losing his foster parents than his mother. Further, he advised "[s]hould there be any evidence to suggest that she cannot, or will not comply, termination of parental rights may be the only alternative available to provide [Alvin] with the permanency and consistency that the child needs."

Dr. Singer's recommendations prompted a third evaluation by Dr. Iofin, who was asked to offer an opinion on whether Lela could "be considered as a minimally adequate parent for [Alvin]." He noted she had shown "significant improvement in her overall functioning[,]" including academic improvement, decrease in physical altercations, and absence of cognitive impairment. He cautioned that there were significant "very valid concerns about her abilities to be in a situation where she will be able to provide minimally adequate care of the child in question[.]" Dr. Iofin found it significant that Lela's counselor, who has had approximately forty sessions with her, continued to note "ongoing, very concerning, and problematic behavior[.]" He cited, for example, " 'the student routinely teases and harasses other students, creating unstable and strained relationships around herself[,]' " which he found confirmed the finding she was "insensitive to the needs of others." The counselor's report also contradicted Lela's assertion she has learned to control herself as shown by the negative interactions she continued to have with her family members. Dr. Iofin also was concerned by Lela's letter writing to "an incarcerated older man" and that school representatives caught her with an "inappropriate sexualized picture of herself in electronic media format." These reflect immaturity as she suffers "setbacks and loses ground frequently after having gained it[.]" In summary, Dr. Iofin stated:

> [T]here is significant amount of different difficulties in different domains that will impair [Lela's] abilities to be a minimally adequate parent for the child in question, but as of purely psychiatric aspects of this case, I do not see direct contraindications for her to have interaction with the child in a structural program, which could be a Mommy and Me program.

This recommendation was tempered, stating "[t]hese specific issues need to be addressed by a clinical psychologist who at the present time does not consider her as a viable candidate to be considered for this specific predicament, and considers termination of parental rights as the most appropriate avenue to use."

The contradiction in Lela's conduct continued to be evident. For example, although Lela's resource parent described her as "a pleasure to have in her home[,]" she repeatedly disregarded

her curfew by staying out all night, thereby jeopardizing her placement. Although the resource mother and Division workers "addressed the behavior and explained the severity of the consequences," Lela persisted. Her grades for the most recent marking period were reported as "unsatisfactory" because she "failed the majority of her classes." The Division arranged for Lela to attend additional training at the Family Life Education Center (FLEC). During a case management hearing, the Division agreed to consider the appropriateness of reunification and investigate the availability of a possible "Mommy & Me" program, but declined to change its permanency plan that included termination of parental rights. Alvin's Law Guardian advocated for a permanent placement and requested the guardianship litigation proceed to trial.

Five days later, Lela was discharged from her therapeutic foster placement because she ran away and was missing for several days. It was learned she returned to her cousin's home, even though the Division had rejected the residence as a placement resource. Lela's conduct prompted the Division's request to have the matter listed for trial.

Visits between Lela and Alvin continued to be held at a nearby shopping mall. Lela's in-home therapy ceased but she continued counseling with Family Connections. She later left her cousin's home, deciding instead to live with her mother, a move not approved by the Division. Lela revealed she was pregnant.

Before trial, Dr. Singer again assessed Lela. He identified her "desire to care for her son," but concluded "the currently obtained data does not suggest that [she wa]s capable of parenting independently. To [Lela's] credit, she appears to be aware that she would require significant structure and support in order to care for her child. At the same time, the data does not suggest that [she] is likely to be able to persist in such an environment." He found "the data suggested that [Lela] is likely to continue to have difficulty creating stability in her own life, never mind the life of a child." Dr. Singer concluded, "considering the totality of the data,

including the length of time [Lela] has had to make improvements in her life that may have led to reunification, ... [she was] not likely to become a viable independent parenting option for [Alvin] in the foreseeable future."

The Law Guardian requested an updated psychological evaluation of Lela and separate bonding evaluations performed by Denise Williams Johnson, Ph.D. Lela was seventeen and informed Dr. Johnson she was two months pregnant. Lela related she and the baby's father had discussed "planning a future together" and had been involved in attending prenatal visits. Dr. Johnson's psychological assessment highlighted Lela's underestimation of difficulties and overestimation of her ability. She noted Lela's failure to conform and strictly comply with boundaries, despite being aware of requirements, and disregarding the impact of non-compliance for Alvin. Dr. Johnson observed Lela "appeared to focus on her own then immediate comfort, rather than focus on what she could have done differently, or focus on the implications of her choices for her role as 'mother' to [Alvin]."

With respect to the bonding evaluation, Dr. Johnson identified "many positive aspects" to Lela's current bond with Alvin, despite her overall style with the child, which was characterized as "confrontation[al]." Dr. Johnson determined Alvin's bond with Lela was "insecure" and he had a "consistently strong and loving bond with both foster parents." She concluded "it would not be in [Alvin]'s best interest to be placed with [Lela] at this time, or in the foreseeable future.... [H]e has waited long enough for permanency with [Lela]. Accordingly, adoption by [the resource parents] is recommended."

The one-day trial was held on June 27, 2011, when Lela was almost eighteen years old. One hundred exhibits were introduced by the Division, without objection from any party. The documentation included the Division's case file, past evaluation reports and testing as discussed above, and excerpts from Dr. Johnson's reports which were later introduced by the Law Guardian. Further, the Division presented testimony from its case worker,

Damion Johnson, who had worked with Lela and Alvin since February 2010.

Johnson characterized Lela's progress as consistently "taking one step forward and two steps back," precluding possible reunification. He noted it "doesn't seem like she really thinks or considers what [Alvin] really feels at this point, what he's most comfortable with, and really take[s] into consideration ... the possibility of ... how it would effect [sic] him or impact him if he were removed[.]" The Division sought to achieve permanency for Alvin through his adoption by his resource parents.

Johnson was specifically questioned regarding why Lela was not granted a second chance in a "Mommy & Me" placement. He discussed his efforts to contact numerous facilities, searching for one which would accept Lela first and then transition Alvin, but all of the programs required the mother and child to enter simultaneously with a stated goal of reunification.

The Division also presented the testimony of its expert, Dr. Singer. Dr. Singer stated his findings from Lela's psychological assessments and the bonding evaluations. He concluded Lela's behavior, despite opportunities, had not improved in the area of stability, concluding she "tends to leave when things just don't go her way or she doesn't feel comfortable" despite the availability of other choices.

He noted Lela was "a significant figure" in Alvin's life and some signs of a healthy bonded relationship existed, but there were no hugs and the child rebuffed Lela's effort to kiss him. If the court ordered termination, Dr. Singer opined Alvin "would likely have a reaction to losing [his] relationship" with Lela, which would be mitigated by his resource parents.

Dr. Singer also reported Alvin was more securely bonded to his resource parents and he would "likely have a significant reaction to losing his foster parents[,]" who he clearly recognizes as his "psychological parents." The impact would "likely be long[-]term" and Lela "would likely have difficulty mustering the emotional

resources needed to tend to [Alvin]'s needs[.]" Further complicating the picture was Lela's need to direct physical and emotional resources to her newborn.

Lela testified on her behalf. She explained she was about to graduate from high school and had secured summer employment. She revealed she had been accepted into a "Mommy & Me" placement in a Tri–Cities home in anticipation of her baby's birth. Lela asserted Alvin could also be placed in the program. She related her desire to reunite with Alvin and recognized his need for continued contact with his resource parents. She then discussed a second program she located in Willingboro,[3] which she found more desirable. Lela suggested she could stay in North Jersey or relocate with Alvin to South Jersey. In the fall, she would start classes to obtain a nurse's aid certificate. She believed she could locate a comparable program in South Jersey.

Addressing her failed therapeutic foster placement, Lela maintained she felt uncomfortable in the home because her foster mother made it clear she preferred younger children and was inconsistent in setting curfews. Lela advised the foster mother would frequently tell her to leave, so she did after making plans to live with her cousin. Lela stated she called her Division caseworker, LaShaun Daniels, to report the problem she was experiencing in the placement and also told Daniels she was moving.

Dr. Johnson was last to testify as the Law Guardian's expert. She detailed her findings and conclusions following the psychological assessments of Lela and the bonding evaluations.

Following summations, the trial judge issued an oral opinion. Finding Alvin was removed from his mother's custody because Lela was not ready to care for a child when Alvin was born and her environment was not safe, the trial judge also found Lela had not achieved circumstances that were "stable enough for her own sake, let alone for a three[-]year[-]old and now a baby on the

---

3 The transcript states the town as "Williams Borough" which we believe is an error.

way[,]" determining Lela still needed to develop "a level of maturity to get herself stable." He noted Lela had made some "questionable decisions" that disrupted her placements without consulting with the Division. The trial judge also found Alvin needed stability and Lela's choices "particularly [in] the last three or four months" reflected instability. The trial judge stated, "[a]long [the] way she's going to have another child coming in, and whether or not she's going to manage that is going to be a big issue. But to place [Alvin] on top of that situation . . . it's just never going to work." The judge found Lela reasonably compliant with services, emphasizing she tried but remained unsuccessful. The Division had "done everything they possibly could in providing services[.]"

Finally, he determined Alvin was "in need of permanency" and further delay was not in his best interests. Crediting the experts' testimony, he concluded because of Alvin's secure bond with his resource parents, his removal would "create severe emotional damage that I don't think [Lela] is in any way capable of mitigating in her current state of stability[,]" yet the resource parents were in a position to mitigate any harm caused by severing Alvin's ties with his mother, although the resource parents may continue her relationship with Alvin.

Concluding the Division met each prong of the statutory test by clear and convincing evidence, the trial judge ordered Lela's parental rights terminated and placed Alvin in the Division's custody to secure his adoption. Lela appeals from the final judgment entered on June 27, 2011.

## II.

Before addressing the issues presented by Lela, we outline the well-established guidelines governing our review. We recite the standards generally considered when reviewing judgments entered following a bench trial and also the legal principles guiding our specific consideration of a judgment terminating parental rights.

## A.

The scope of our review of a trial court's factual findings is limited. *N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 279, 914 *A.*2d 1265 (2007). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." *Cesare v. Cesare*, 154 *N.J.* 394, 411–12, 713 *A.*2d 390 (1998). We accord particular deference to the trial judge's factfinding " '[b]ecause of the family courts' special jurisdiction and expertise in family matters[.]' " *N.J. Div. of Youth & Family Servs. v. M.C. III*, 201 *N.J.* 328, 343, 990 *A.*2d 1097 (2010) (quoting *Cesare, supra,* 154 *N.J.* at 413, 713 *A.*2d 390). Reversal is warranted only when a trial court's findings are "so wide of the mark that a mistake must have been made[,]" *M.M., supra,* 189 *N.J.* at 279, 914 *A.*2d 1265 (quotation marks and internal citation omitted), including factual findings " 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]' " *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) (quoting *Fagliarone v. Twp. of N. Bergen,* 78 *N.J.Super.* 154, 155, 188 *A.*2d 43 (App.Div.), *certif. denied,* 40 *N.J.* 221, 191 *A.*2d 61 (1963)). *See also N.J. Div. of Youth & Family Servs. v. G.L.,* 191 *N.J.* 596, 605, 926 *A.*2d 320 (2007) (discussing "limited" appellate review).

In our review, we are also obliged to accord deference to the trial judge's credibility determinations. *M.M., supra,* 189 *N.J.* at 279, 914 *A.*2d 1265. Such deference is appropriate because the trial judge has "a 'feel for the case' " and is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand[.]" *N.J. Div. of Youth & Family Servs. v. E.P.,* 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (quoting *M.M., supra,* 189 *N.J.* at 293, 914 *A.*2d 1265). "When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." *N.J. Div. of Youth & Family Servs. v. F.M.,* 375 *N.J.Super.* 235, 259, 867 *A.*2d 499

(App.Div.2005) (citing *In re Guardianship of DMH*, 161 *N.J.* 365, 382, 736 *A.2d* 1261 (1999)). Consequently, when a reviewing court concludes there is satisfactory evidentiary support for the trial court's findings, " 'its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal.' " *Beck v. Beck*, 86 *N.J.* 480, 496, 432 *A.2d* 63 (1981) (quoting *State v. Johnson*, 42 *N.J.* 146, 162, 199 *A.2d* 809 (1964)).

When "the focus of the dispute is … alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom, the traditional scope of review is expanded." *M.M., supra*, 189 *N.J.* at 279, 914 *A.2d* 1265 (quotation marks and internal citations omitted). *See also G.L., supra*, 191 *N.J.* at 605, 926 *A.2d* 320 (discussing expanded scope of review). In such instances, deference is appropriately accorded to factfinding; however, the trial judge's legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.2d* 1230 (1995). Our review of a trial court's legal conclusions is always de novo. *Ibid.*

### B.

Parents have a constitutionally protected interest in raising their biological children. *N.J. Div. of Youth & Family Servs. v. I.S.*, 202 *N.J.* 145, 166, 996 *A.2d* 986 (2010); *E.P., supra*, 196 *N.J.* at 102, 952 *A.2d* 436; *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 346, 736 *A.2d* 1246 (1999). "The Federal and State Constitutions protect the inviolability of the family unit." *In re Adoption of a Child by W.P. & M.P.*, 308 *N.J.Super.* 376, 382, 706 *A.2d* 198 (App.Div.1998) (citing *Stanley v. Illinois*, 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212–13, 31 *L.Ed.2d* 551, 558–59 (1972)), *appeal vacated* 163 *N.J.* 158, 748 *A.2d* 515 (2000). However, the State "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.*, 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61

*L.Ed.*2d 101, 119 (1979) (citing *Wisconsin v. Yoder,* 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L.Ed.*2d 15, 33 (1972)).

The New Jersey Legislature recognizes the importance of strengthening and preserving the integrity of family life. However, in the exercise of its *parens patriae* responsibility, it acknowledges the paramount concern remains the health and safety of the child. *N.J.S.A.* 30:4C–1(a). Therefore, children must be protected from serious physical and emotional injury and the court may examine whether " 'it is in the child's best interest to preserve the family unit' " or sever the parent-child relationship. *A.R.G., supra,* 361 *N.J.Super.* at 67, 824 *A.*2d 213 (quoting *N.J.S.A.* 30:4C–15.1a).

Termination of parental rights "permanently cuts off the relationship between children and their biological parents." *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). "Few forms of state action are both so severe and so irreversible." *Santosky v. Kramer,* 455 *U.S.* 745, 759, 102 *S.Ct.* 1388, 1397, 71 *L.Ed.*2d 599, 610 (1982).

"The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." *K.H.O., supra,* 161 *N.J.* at 347, 736 *A.*2d 1246. *See also N.J. Div. of Youth & Family Servs. v. F.H.,* 389 *N.J.Super.* 576, 621, 914 *A.*2d 318 (App.Div.), *certif. denied,* 192 *N.J.* 68, 926 *A.*2d 853 (2007). The best interests standard, initially formulated by the Supreme Court in *New Jersey Division of Youth and Family Services v. A.W.,* 103 *N.J.* 591, 604–11, 512 *A.*2d 438 (1986), and later codified in *N.J.S.A.* 30:4C–15.1a, requires the State to establish each of the following prongs by clear and convincing evidence before parental rights may be severed:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that

separating the child from his resource family [formerly referred to as "foster"] parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

*See also K.H.O., supra,* 161 *N.J.* at 347–48, 736 *A.*2d 1246. These four factors are neither discrete nor separate, but are interrelated and overlap. Together they are designed to create a composite picture of "what may be necessary to promote and protect the best interests of the child." *N.J. Div. of Youth & Family Servs. v. R.L.,* 388 *N.J.Super.* 81, 88, 906 *A.*2d 463 (App.Div.2006) (citing *K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246), *certif. denied,* 190 *N.J.* 257, 919 *A.*2d 850 (2007). Application of the four-part test is "extremely fact sensitive[,]" requiring "particularized evidence that addresses the specific circumstances of the individual case." *Ibid.*

When a child's biological parent resists termination of parental rights, the cornerstone of the inquiry becomes whether the parent can "cease causing [his or her] child harm" and become fit to assume the parental role within time to meet the child's needs. *J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312 (citing *A.W., supra,* 103 *N.J.* at 607, 512 *A.*2d 438). The analysis employs "strict standards to protect the statutory and constitutional rights of the natural parents." *Ibid.* The burden rests on the State " 'to demonstrate by clear and convincing evidence' that risk of 'serious and lasting [future] harm to the child' is sufficiently great as to require severance of the parental ties." *W.P. & M.P., supra,* 308 *N.J.Super.* at 383, 706 *A.*2d 198 (quoting *J.C., supra,* 129 *N.J.* at 10, 608 *A.*2d 1312).

### III.

On appeal, Lela challenges the sufficiency of the evidence presented, arguing the Division failed to establish each of the four prongs by clear and convincing evidence. She maintains she

never endangered Alvin and no enduring harm exists. Further, her efforts toward improving her circumstances reflect her willingness and ability to eliminate any perceived harm. She also disputes the finding that the Division fulfilled its obligation to provide services, citing its refusal to secure a second "Mommy & Me" placement. Finally she rejects the proposition that severing her parental rights would not cause Alvin more harm than good. We examine each of these contentions.

## A.

Under the first prong of the best interests standard, the Division must prove by clear and convincing evidence that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship[.]" *N.J.S.A.* 30:4C–15.1a(1). "The harm shown ... must be one that threatens the child's health and will likely have continuing deleterious effects on the child." *K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246.

In this matter, it is undisputed that Alvin was removed from Lela's custody at birth solely because she was a minor in the Division's custody and he too needed the Division's protection. *N.J.S.A.* 9:6–8.8a. Without question, Lela did not affirmatively cause harm to her son resulting in his removal. However, the "absence of physical abuse or neglect is not conclusive[,]" *A.W., supra,* 103 *N.J.* at 605, 512 *A.*2d 438, as "the psychological aspect of parenthood is more important in terms of the development of the child and [his] mental and emotional health than the coincidence of biological or natural parenthood." *Sees v. Baber,* 74 *N.J.* 201, 222, 377 *A.*2d 628 (1977) (citations omitted). "Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." *In re Guardianship of K.L.F.,* 129 *N.J.* 32, 44, 608 *A.*2d 1327 (1992) (citing *J.C., supra,* 129 *N.J.* at 18, 608 *A.*2d 1312). Consequently, trial courts must consider the potential psychological

damage that may result from reunification as the "potential return of a child to a parent may be so injurious that it would bar such an alternative." *A.W., supra,* 103 *N.J.* at 605, 512 *A.*2d 438.

The trauma fourteen-year-old Lela suffered at the hands of her parents was discovered at the time she bore Alvin. The psychological and psychiatric assessments from 2007 and 2008 vividly depict a young teen who understandably displayed sexualized behaviors, aggressive confrontational lashing out, immaturity, and impulsivity. She needed to unwind her own emotional needs, including the conflict regarding her mother who failed to protect her from harm, as well as struggle to discern appropriate societal behaviors in the absence of role models and family support. Clearly, structure and selflessness—key concepts in childrearing—were foreign. The Division devised a course to address the multitude of needs presented by Alvin and Lela.

Lela does not disagree that she was not ready to care for Alvin when he was born. Rather she maintains the Division failed to show Alvin was harmed in her care and her youth cannot adequately justify the presence of harm. We agree a parent's age alone will not define whether she can provide adequate parenting or the capacity to avoid physical or emotional harm to her child. In this matter, Lela's impulsivity, rebellion, and poor judgment compromised Alvin's safety.

Lela's impulsive, aggressive behaviors continued almost unabated for more than a year following Alvin's birth. Her confrontational defiance precluded her success in the "Mommy & Me" program; prevented her sister from continuing as a resource in rearing Alvin; and terminated her placement at the YMWCA and a therapeutic foster home. Lela disregarded her obligation to attend school, assaulted those with whom she disagreed, disobeyed her resource parents, disregarded curfews, ran away, and battled against the structure of school. To her credit, Lela did not turn to substance abuse and other illegal conduct, continued counseling and began to accept its benefits.

We reject the notion that the Division merely removed Alvin because Lela was young when she gave birth. From Alvin's birth until the Division filed for guardianship, Lela was not able or willing to comport her behavior to focus on her son's needs. Our review of the record leaves little doubt Alvin was removed because his safety would have been compromised if placed in Lela's care. *See N.J.S.A.* 30:4C–15(c) (requiring proof of the "best interests" of the child, not necessarily the presence of parental fault).

Another important factor necessitating Alvin's removal was Lela's displayed symptoms of mental illness from 2007 to 2009. Lela's mother suffered from paranoid schizophrenia. When examined by Dr. Iofin on June 11, 2007, Lela reported signs of psychiatric problems such that Dr. Iofin found Lela "presented with a significant amount of different psychiatric symptoms[,] which include[ed] her acknowledgment of visual and tactile hallucinations ..., a presence of flashbacks pointing towards Post Traumatic Stress problems, and having problems with Impulse Control." Hallucination experiences were repeated to Dr. Trott during his June 1, 2009 evaluation. Medication was prescribed for what was believed to be psychosis, which Lela did not take.

By September 6, 2009, Lela disavowed the information she had previously imparted to evaluating mental health professionals and suggested she was just "playing" with them. This statement speaks volumes: either Lela began withholding information she perceived would "hurt her chances" or she did not seriously appreciate the importance of the evaluations by professionals when considering her ability to parent her infant son. In either case, Alvin was at risk of harm.

Despite Lela's lack of culpability for Alvin's initial removal, the ensuing years reflected minimal change in her ability to resolve the identified safety concerns or to achieve necessary competency in parenting. The Division is not required to wait until a child actually suffers an injury to substantiate harm justifying his removal from parental custody, pursuant to *N.J.S.A.* 30:4C–15.1a(1). *See also A.W., supra,* 103 *N.J.* at 616 n. 14, 512 *A.*2d 438

(stating "it would make no sense to wait until [the child] had been injured" to effectuate removal). We determine the trial court's finding regarding the Division's satisfaction of this factor is clearly and convincingly supported by the evidence of record.

### B.

The second factor of the best interests standard focuses on parental unfitness and overlaps with the proofs supporting the first prong. *D.M.H., supra*, 161 *N.J.* at 379, 736 *A.*2d 1261. The court considers not only "whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." *R.L., supra*, 388 *N.J.Super.* at 87, 906 *A.*2d 463.

Under the second prong, the standard is whether it is "reasonably foreseeable" that a parent can "cease to inflict harm upon" the child and demonstrate adequate parenting that would not place the child's physical or mental health in "substantial jeopardy[.]" *A.W., supra*, 103 *N.J.* at 607, 512 *A.*2d 438.

To satisfy its burden, the Division must show harm to the child "continue[s] because the parent is unable or unwilling to overcome or remove [it]." *N.J. Div. of Youth & Family Servs. v. P.P.*, 180 *N.J.* 494, 506–07, 852 *A.*2d 1093 (2004) (quotation marks and internal citations omitted). This prong also may be satisfied by signs "of parental dereliction and irresponsibility, such as the parent's . . . inability to provide a stable and protective home or support for the child." *K.H.O., supra*, 161 *N.J.* at 353, 736 *A.*2d 1246. Also included in this inquiry is whether delay in permanency will cause further harm and whether the child has bonded to his or her resource parents to the extent that separation from them in itself would cause the child "serious and enduring emotional or psychological harm[.]" *N.J.S.A.* 30:4C–15.1a(2). We have made it clear that "[c]hildren must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." *N.J. Div. of Youth &*

*Family Servs. v. S.F.*, 392 *N.J.Super.* 201, 210, 920 *A.*2d 652 (App.Div.2007). Accordingly, "expeditious, permanent placement" is favored over "protracted efforts for reunification[.]" *N.J. Div. of Youth & Family Servs. v. C.S.*, 367 *N.J.Super.* 76, 111, 842 *A.*2d 215 (App.Div.), *certif. denied*, 180 *N.J.* 456, 852 *A.*2d 192 (2004).

In late 2009, sixteen-year-old Lela began to accept the benefit of counseling and realized she had an obligation to fulfill Alvin's needs and not just her own. Lela repeatedly expressed love for her son and began to back up her words with her conduct in an effort to achieve reunification. She refocused on school achievements, regularly attended therapy, rarely missed visitations, and completed additional parenting skills. Dr. Fite was able to eliminate psychosis or mental illness as a barrier to reunification and found Lela was learning to control her actions and develop insight regarding how her behaviors affected others.

We do not minimize these strides. Lela rose above the victimization she suffered and assumed some direction for her life. In fact, the years of effort she has expended will provide a solid foundation for parenting. However, our focus must be on Alvin. The emphasis of the Federal Adoption and Safe Families Act of 1997, Pub.L. No. 105-89, 111 Stat. 2115 (codified as amended in scattered sections of 42 *U.S.C.*), has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being. *See N.J.S.A.* 30:4C-15. *See also C.S., supra*, 367 *N.J.Super.* at 111, 842 *A.*2d 215. "Keeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law." *N.J. Div. of Youth & Family Servs. v. A.G.*, 344 *N.J.Super.* 418, 438, 782 *A.*2d 458 (App.Div.2001). When viewing the facts through the prism of Alvin's needs, as the law requires, the uncontroverted record reflects Lela could not grasp the nature and necessity of prioritizing Alvin's needs above her own and never achieved an appreciation for the young child's need for stability. Accordingly, Alvin remains at risk if placed in her care.

During trial, Dr. Singer related his findings following his May 2, 2011 evaluation, keying on Lela's inability to provide stability and consistency in her life and for Alvin. For example, during a period when the Division was considering whether to again place Lela and Alvin in a "Mommy & Me" program, Lela disappeared from her therapeutic foster home in favor of living with her cousin, despite being told her cousin's criminal history precluded her as an acceptable placement. Lela knew Alvin could not be accommodated in her cousin's home, but went there anyway. Then, after a disagreement with her cousin, Lela moved to her mother's home, again disregarding the Division's instructions that this was inappropriate for Alvin. Dr. Singer labeled these impulsive, poorly planned moves as "a step backwards" and asserted Lela's instability persists as she continues to make poor choices that adversely impact her parenting ability.

Dr. Singer stated Lela's instability precluded her from providing a stable home for Alvin, which was unlikely to change because her prognosis for compliance with necessary structure was poor. Acknowledging "the best predictor of the future is the past ... behavior[,]" Dr. Singer opined Lela was "not likely to remedy these issues in the foreseeable future in terms [of] or with respect to [Alvin]."

Dr. Singer also discussed the additional impact of Lela's current pregnancy, noting

> now we're not concerned solely about [Lela]'s ability to integrate [Alvin] back into her family just as a mother and child, but we have to be concerned with integrat[ing] [Alvin] into a family where there'd be a newborn.... Certainly[,] it increases [Lela]'s load in terms of the need to muster the emotional resources as well as the physical resources, not just to tend to the needs of a three year old child but, certainly, to tend to the needs of a newborn.

He concluded Lela "lacked ... both the physical and emotional resources needed to parent [Alvin]" and could not afford him adequate parenting and protection.

Dr. Johnson concurred with Dr. Singer, testifying Lela's "community instability, her ability to stay in one place and her ability to follow the rules where she was" thwarted reunification. In the

months after Lela left her therapeutic foster home, she had not reestablished herself. Dr. Johnson also stated Lela took no "blame" for leaving that placement, suggesting she will make the same error again. Finally, she admitted she made the move without considering its potential impact on Alvin.

Lela's stated desire is to raise her son, a laudable and well-meaning objective. However, this ideal is jolted by the reality the child needs stability and permanency, concepts that continue to elude Lela. *See In re Adoption of a Child by P.S. & J.S.*, 315 *N.J.Super.* 91, 120, 716 *A.*2d 1171 (App.Div.1998) ("A child's need for stability, for consistency, and for permanence cannot be ignored in reaching [ ] the most challenging decision any court can face."). The experts unequivocally agree Lela had not yet achieved stability for herself, making it impossible for her to provide the same for Alvin.

Lela's own testimony highlighted this difficulty. She suggested she was accepted in a Tri–Cities North Jersey "Mommy & Me" program, stated she was to attend college in North Jersey, and also was accepted in a nursing certificate program. She then explained she located a different "Mommy & Me" program in South Jersey, which she believed was more desirable for her needs and figured she would move to Willingboro, then find a new educational program in South Jersey, following her move. Lela never suggested she visited the Willingboro facility, or even spent time in Burlington County. Certainly, she has no prior connection to, or family living in, that locale, raising the uncertainty of her satisfaction with such a dramatic change. Her plans omitted mention of her baby's father, with whom, she told Dr. Johnson, she was discussing a future. More interestingly, Lela did not discuss how she intended to maintain Alvin's connection to his resource parents if she moved to Willingboro. Lela's "plan" is a mere possibility; it appears impulsive based on Lela's unspecific desires and not well thought out.

At trial, Lela agreed she could not independently care for her son and needed the structure and housing of another "Mommy &

Me" placement and the financial support of the State. The problem remained whether she could accept the structure and abide the rigidity of such a program. To date, Lela has not demonstrated the internal discipline to comply when confronted with restriction of her perceived freedoms and choices. Following Dr. Singer's maxim "the best predictor of the future is the past," the evidence clearly and convincingly supports Lela's inability to adequately parent Alvin. Lela offered no countervailing evidence to support her general assertion that this time will be different.

We are satisfied the record supports the trial judge's conclusion that the Division has satisfied the second prong by clear and convincing evidence. The chaos of Lela's life has lessened but has not ended, with likely more uncertainty when her baby arrives. Despite the three years that have passed and the myriad of efforts extended, Lela's life remains unstable and she continues to be unable to provide Alvin a safe and stable home. *K.H.O., supra,* 161 *N.J.* at 357, 736 *A.*2d 1246. Further, delay in satisfying Alvin's need for a permanent placement will add to his harm. *M.M., supra,* 189 *N.J.* at 281, 914 *A.*2d 1265. "A child is not chattel in which a parent has an untempered property right" and should not "be held prisoner of the rights of others, even those of his or her parents." *C.S., supra,* 367 *N.J.Super.* at 110–11, 842 *A.*2d 215.

Finally, we reject Lela's contention the trial court's determination was an erroneous value judgment on the quality of her parenting versus that of the foster parents. *See J.C., supra,* 129 *N.J.* at 21, 608 *A.*2d 1312. The Division's evidence exposed the risks of harm if Alvin were placed in his mother's care, whether in a "Mommy & Me" program or not. Under these circumstances, continued reunification efforts were not justified. *C.S., supra,* 367 *N.J.Super.* at 111, 842 *A.*2d 215.

## C.

The third prong of the best interests standard requires the Division to make "reasonable efforts to provide services to

help the parent correct the circumstances" that necessitated removal and placement of the child in foster case. *N.J.S.A.* 30:4C–15.1a(3). "Reasonable efforts" consist of services "to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" *N.J.S.A.* 30:4C–15.1c.

The reasonableness of the efforts depends upon the facts and circumstances of each case. *D.M.H., supra,* 161 *N.J.* at 390, 736 *A.*2d 1261. Provision of services under the third prong "contemplates efforts that focus on reunification[,]" *K.H.O., supra,* 161 *N.J.* at 354, 736 *A.*2d 1246, and "may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." *M.M., supra,* 189 *N.J.* at 281, 914 *A.*2d 1265. The services provided to meet the child's need for permanency and the parent's right to reunification must be " 'coordinated' " and must have a " 'realistic potential' " to succeed. *N.J. Div. of Youth & Family Servs. v. J.Y.,* 352 *N.J.Super.* 245, 267 n. 10, 800 *A.*2d 132 (App.Div.2002) (quoting *N.J.A.C.* 10:133–1.3).

Yet, the reasonableness of the Division's efforts "is not measured by their success[,]" although a court considers whether a parent actively participated in the reunification effort. *D.M.H., supra,* 161 *N.J.* at 393, 736 *A.*2d 1261. Ultimately, "[t]he failure or lack of success of [the Division's] efforts does not foreclose a finding that the Division met its statutory burden to try to reunify the children with the family." *F.H., supra,* 389 *N.J.Super.* at 620, 914 *A.*2d 318 (citing *D.M.H., supra,* 161 *N.J.* at 393, 736 *A.*2d 1261). Moreover, "[e]ven if the Division ha[s] been deficient in the services offered to" a parent, reversal of the termination order is not necessarily "warranted, because the best interests of the child controls" the ultimate determination regarding termination of parental rights. *Id.* at 621, 914 *A.*2d 318.

The court must also weigh available "alternatives to termination of parental rights[.]" *N.J.S.A.* 30:4C–15.1a(3). This includes rela-

tive placements for the child that would obviate the need for termination of parental rights and adoption.

We first address an additional wrinkle posed by the matter, inasmuch as Lela was a child in the Division's custody when Alvin was born. When the Division assumes custody, care and supervision to assure a child's interests are protected to "avoid an ongoing risk to the child's life, safety, or health," *N.J.S.A.* 9:6–8.31b, it assumes responsibility to reunite the family if the child can be safely returned home. *N.J.S.A.* 9:6–8.51. The question raised is whether Lela's custodial status requires the Division to continue its reunification efforts.

In making the required fact-sensitive review of whether the services extended were reasonable, we believe the Division's burden, in this exceptional instance, is a heightened one, dictated by the special circumstance posed by a child-parent's young age. We conclude the Division's efforts must include satisfactory services to aid the development of the child-parent's maturation and necessary skills to adequately parent his or her child. The balancing test considers, on the one hand, the child-parent's abilities, motivations, capabilities and other familial resources to reach this goal and, on the other hand, the infant's need for achieving stability and permanency within a reasonable time period. As applied, there is no checklist or prescribed length of time the Division must continue its efforts, as that remains fact-sensitive. We do note these circumstances raise the likely need to extend services and efforts beyond the twelve-month timeframe mandated by *N.J.S.A.* 30:4C–61.2a(2) and *N.J.S.A.* 9:6–8.54(b), which require a trial court to conduct a permanency hearing for a child removed from the care of his or her parent or guardian to "determine whether the family will continue towards reunification or whether an alternative plan must be adopted." *Div. of Youth & Family Services v. G.M.*, 198 *N.J.* 382, 400, 968 *A.*2d 698 (2009).

In Lela's case, the horrific circumstances she experienced required removal from her parent's care. The day following the Family Part's order for her protection, Alvin was born. Once

reunification of Lela and her mother was not an option, the Division's efforts justifiably concentrated on teaching this very young teen to parent her son.

The one-hundred exhibits introduced by the Division at trial are replete with services extended, spanning from May 2007 through May 2011, in an effort to reunite Lela and Alvin. These services addressed medical, logistical, educational, housing, psychological, psychiatric, and financial needs along with the provision of years of visitation, one year of parenting classes, life skills, years of anger management, individual therapy, and other counseling. The Division continued its efforts to educate Lela on the obligations of care involved in being a mother, not mere rote tasks of diapering and feeding. Even in light of setbacks, services continued, aimed at Lela's individual healing as well as nurturing her son.

Following our review of the evidence, we determine the Division has met the heightened burden resulting from Lela's custodial status, the extent and nature of which accorded with her youth, and attempted to achieve reunification. We find no flaw in the trial judge's determination the Division extended reasonable efforts in this case.

Lela maintains she fully complied with all services extended and challenges the failure of the Division to provide what she believes is the one service that would have assured reunification: another chance at a "Mommy & Me" program. She attacks the reasonableness of Division efforts, especially in light of the "ineffective and desultory" attempt to locate a "Mommy & Me" program in 2010. We are not persuaded.

Caseworker Johnson explained his efforts to secure such a placement were hindered by two facts. First, funding requires Lela and Alvin must enter the program simultaneously; however, based upon expert recommendations, Alvin needed to "be transitioned" after Lela demonstrated an ability to comply with the program's structure. Second, the case plan goal required modification to reunification. While the Division weighed its need to

modify its case goal, Lela left her placement to live with her cousin.

In the three years prior to trial, Lela unquestionably matured. Yet, contrary to her suggestion, she had not fully complied with the Division's services. Most notably, she continued to disrupt her placements in favor of relationship decisions found detrimental to Alvin's interests. In this significant regard, Lela has not achieved the level of stability and security necessary to care for a young child. She argues her conduct was reasonable in light of the Division's failure to find a new placement fast enough. Such a suggestion deflects her responsibility for her conduct and disregards the fact her choices remained motivated by fulfilling her interests, desires, and needs, without regard to the resultant impact on Alvin.

The Division's decision to pursue termination of parental rights rather than continue to hope Lela would modify her conduct was reasonably focused on Alvin's paramount need for safety, security, and permanency. Considering the totality of the circumstances, we conclude the Division's efforts to achieve reunification were reasonable. Moreover, it was not unreasonable to decline modification of Alvin's permanency plan to allow Lela another attempt in a "Mommy & Me" program, in light of evidence the effort would not have a " 'realistic potential' " to succeed. *J.Y., supra,* 352 *N.J.Super.* at 267 n. 10, 800 *A.*2d 132 (quoting *N.J.A.C.* 10:133–1.3).

### D.

Under the last prong of the best interests standard, the Division must prove the child will not suffer greater harm from the termination of ties with his biological parent than from the permanent disruption of his relationship with his resource family. *K.H.O., supra,* 161 *N.J.* at 355, 736 *A.*2d 1246. *See also N.J.S.A.* 30:4C–15.1a(2) (citing evidence that separating the child from his resource family would cause serious harm). The overriding consideration under this prong remains the child's need for

permanency and stability. *Id.* at 357, 736 *A.*2d 1246. If a child can be returned to the parental home without endangering his health and safety, the parent's right to reunification takes precedence over the permanency plan. *A.W., supra,* 103 *N.J.* at 607–09, 512 *A.*2d 438. On the other hand, "termination of parental rights likely will not do more harm than good" where the child has bonded with the resource parents in a nurturing and safe home. *E.P., supra,* 196 *N.J.* at 108, 952 *A.*2d 436. The Division's clear and convincing evidence "must show 'that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm.'" *Ibid.* (quoting *J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d 1312). In meeting its burden under this prong, the Division should adduce testimony from a "well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation" of the child's relationship with the natural and resource parents. *J.C., supra,* 129 *N.J.* at 19, 608 *A.*2d 1312.

Lela agrees Alvin's bond with his resource parents was stronger than his bond to her. However, she argues the trial judge erroneously disregarded the fact she too was strongly bonded to Alvin and expert recommendations provided for reunification. We disagree.

All prior expert evaluations counseled against allowing Lela to independently parent her son. Dr. Trott's June 1, 2009 report stated, Lela "should not be visiting her infant without close supervision." Dr. Iofin's September 6, 2009 report stated, "I [would] not consider her as a reasonable candidate for reunification with her child." His updated report on November 15, 2010, noted Lela's improvement, but found "there is significant amount of different difficulties of different domains that will impair her abilities to be a minimally adequate parent for the child in question[.]"

Dr. Fite's June 24, 2010 report concluded, "I do not believe she is currently stable enough to provide minimally adequate care for her son, now or in the near future."

The first discussion of possibly attempting a second "Mommy & Me" program was raised by Dr. Singer's combined psychological and bonding evaluation in October 2010. The report never suggested reunification was warranted, rather it concluded, "While the data does not suggest [Lela] can independently parent [Alvin] either now or in the near future, the data does suggest that, with appropriate intervention, [Lela] is likely to become a viable parenting option for [Alvin], under supervision." In that regard, Dr. Singer recommended Lela commence a "highly structured" "Mommy & Me" program, then Alvin would be transitioned under supervised care, once Lela had adjusted and accepted the structure. Dr. Singer did not recommend Alvin's placement should be terminated in favor of this program, rather he cautioned in the event of another failed placement with Lela, there was an increased risk of "enduring harm" for Alvin because of the separation from his resource family.

In his subsequent review performed in June 2011, following Lela's rejection of her placement, Dr. Singer concluded, "This child clearly requires consistency and permanency. The available data does support [the Division]'s plan to pursue termination of parental rights as the data does not suggest [Lela] will be able to provide consistency and permanency for her son in the foreseeable future." Dr. Singer's trial testimony reaffirmed this opinion. He opined were Alvin to live with Lela he "would have to live that chaotic lifestyle that [Lela] has lived over time. And ... that chaotic lifestyle is totally contrary to the permanency and consistency that a child needs." He also added "significant" "long-term" harm was likely to result were Alvin separated from his resource family.

Finally, Dr. Johnson's bonding testimony supported the fact that Lela and Alvin have an emotional connection, albeit a tenuous one. Her overall style with him could be characterized as "having chronic and varying levels of confrontation." Dr. Johnson characterized the bond between Alvin and Lela as "insecure" and recommended termination of parental rights was in Alvin's best

interests because "it would be traumatic for him to be removed from the only home that he's really ever known." She found Alvin had a "consistently strong and positive bond with both foster parents" with whom he has lived for almost his entire life, and who would mitigate any harm resulting from the severing of ties to Lela.

The trial judge credited the experts, whose unequivocal testimony clearly and convincingly stated that separating Alvin from his resource parents would cause serious and enduring emotional harm. *See also N.J. Div. of Youth & Family Servs. v. T.C.*, 251 *N.J.Super.* 419, 440, 598 *A.*2d 899 (App.Div.1991) (concluding termination was justified "to spare the child grievous and irreparable psychological harm"). While Alvin has a relationship with Lela, the harm he would face were those ties severed would not be enduring, as it would be properly mitigated by his resource parents. This result is additionally supported by the trial court's finding that further delay in establishing a stable and permanent home for Alvin, who has been in placement for almost the entirety of his life (now more than four years), would continue to cause harm.

## IV.

In conclusion, we determine the trial court's findings are properly supported by clear and convincing evidence and the legal conclusions drawn therefrom will not be disturbed. Alvin's right to a permanent, safe, and stable home must prevail over Lela's desire to continue her efforts toward possibly achieving adequate parenting and reunification.

Affirmed.