# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3159-17T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

S.L.S.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP  OF I.X.W.,

    a Minor.

_____

Submitted October 30, 2018 – Decided  November 27, 2018

Before Judges Hoffman, Suter and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0041-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven E. Miklosey, Designated Counsel, on the brief.)

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Melvina D. Fennell, Deputy Attorney General, on the brief.)

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith A. Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant S.L.S.[1] appeals from the order terminating parental rights to her child, I.X.W., arguing that plaintiff, New Jersey Division of Child Protection and Permanency (Division), failed to establish prongs two, three, and four of the best interests test established by N.J.S.A. 30:4C-15.1(a). The Law Guardian supported termination before the trial court and, on appeal, joins the Division in urging us to affirm. We affirm.

S.L.S. is the biological mother of I.X.W., who was born in February 2015. The child's father is P.W.[2] The Division became involved with this family, prior

---

[1] Pursuant to Rule 1:38-3(d), we use initials to protect the confidentiality of the participants in these proceedings.

[2] P.W. voluntarily surrendered his parental rights on February 13, 2018, at the guardianship trial.

to I.X.W.'s birth, on September 24, 2014, when it received a referral that S.L.S. was "actively using cocaine, marijuana, abusing alcohol, and was not taking any medications," and that P.W. knocked out one of her teeth. A Division caseworker met with S.L.S. at her home and warned her that she risked losing the baby if the illicit prenatal drug use continued. At that time, S.L.S. tested positive for cannabis and cocaine. She advised the caseworker that she "might have an abortion," denied the need for services, and closed the door on the caseworker.

Between October and December of 2014, the Division continued to receive reports that S.L.S. was using drugs and alcohol while pregnant. On October 12, 2014, she was hospitalized for mood disorder, polysubstance abuse, suicidal ideations and attempts. Her landlord notified the Division on December 8, 2014, that S.L.S. nearly set the house on fire while using heroin and crack cocaine. The following week, she was hospitalized in a psychiatric ward because she expressed fear that people wanted to kill her and her unborn baby. Her drug tests were positive again, and domestic violence continued with P.W. The Division referred S.L.S. for services, but she refused to participate.

On December 26, 2014, S.L.S. was arrested for drug possession and a disorderly person's offense. While being transported in a police car, she tried to

kick out the window. The next day, she was brought to the emergency room, high on cocaine, and reported that she drank a thirty-pack of Coors Light and eight cans of Natural Ice beer. Two days later on December 29, 2014, she experienced suicidal and homicidal ideations again towards the unborn child. Since she was non-compliant in taking her medications for schizophrenia, bipolar, and mood disorders, she was involuntarily committed to Trenton Psychiatric Hospital, where she remained until the baby was born. At the hospital, she was diagnosed with episodic mood disorder, personality disorder, and drug dependency. As part of her medication regimen, she was prescribed Haldol for psychosis.

After the baby was born, S.L.S. had supervised visitation with him at Trenton Psychiatric, where she "appeared to be manic," and was confrontational with staff. A Division caseworker observed S.L.S. being rough with I.X.W., wrapping blankets around his face, swinging him too hard, and not supporting his head. Following his hospital discharge in February 2015, I.X.W. was placed in a resource home. The Division was granted custody of the baby and attempted to facilitate supervised visitation with the mother, who was homeless, and failed to maintain contact. During a Family Team Meeting on March 16, 2015, S.L.S.

4

had a "labile affect," and "shifted rapidly between sitting quietly and agitation." She stated that she was too overwhelmed to hold the baby.

Another visit was held on March 26, 2015, and S.L.S. "smelled of alcohol," and was argumentative when the caseworker questioned her about it. S.L.S. requested that her son be placed with his Aunt Jane. A random drug screen on S.L.S. yielded positive results for alcohol, marijuana, and cocaine on March 30, 2015. On April 10, 2015, the trial court ordered her to be clean and sober as a condition for continued visitation.

After learning S.L.S. was hospitalized, the Division arranged to have her admitted to the Salvation Army Rehabilitation Program in Delaware on April 20, 2015. Two weeks later, she was discharged after assaulting another resident. S.L.S. lost contact with the Division, until she was incarcerated at the Mercer County Correctional Center on May 22, 2015, and medicated for schizophrenia and depression.

Following her release on June 30, 2015, she visited I.X.W. with P.W. at the Division's office. She was advised to obtain mental health substance abuse treatment from the Greater Trenton Behavioral Health Crisis Center and to comply with medications. She expressed interest in attending a "Mommy and Me" program.

The next day, S.L.S. was hospitalized and the Division had to reschedule her evaluation. After her release, at a follow up visit with the baby and P.W. on July 29, 2015, caseworkers noticed she had a black eye and scrapes on her legs. S.L.S. claimed "[P.W.] and her neighbors attacked her." She declined domestic violence counseling. She appeared, "unstable, agitated, and under the influence of something during the visit, and the Division staff had to take [I.X.W.] away from her and end the visit." An appointment was made for S.L.S. at Trenton Treatment Center on August 18, 2015, but she failed to appear.

As a consequence of frequent incarcerations and her failure to maintain contact with the Division, the trial court judge determined that S.L.S. had not improved, and he suspended visitation until her mental health was stabilized. The child was placed with his Aunt Jane, however, her cardiac condition left her unable to care for him. In October 2015, I.X.W. was placed with his first resource parents, A.W. and D.W.

On October 14, 2015, P.W. informed the Division that S.L.S. was incarcerated for violating a domestic violence restraining order he obtained against her, and he reported she "went crazy." While incarcerated, S.L.S. told a caseworker that she wanted to participate in parenting, substance abuse, and

A-3159-17T4

anger management programs at the prison. She was released on January 28, 2016, and a permanency hearing was held on February 1, 2016.

The trial court approved the Division's plan of termination of parental rights. S.L.S. was arrested during the hearing for creating a disturbance in the courthouse and released later that day, only to be arrested immediately thereafter for assault. After her release, S.L.S. was accepted into a long-term residential program at Integrity House commencing on May 11, 2016. She refused to sign release forms for the Division, thereby thwarting their efforts to obtain her progress reports.

On April 4, 2016, the Division filed a complaint for guardianship. The next day, S.L.S. was released from prison. She failed to contact the Division or return to Integrity House. She was incarcerated again on May 2, 2016, for one month after violating the restraining order with P.W. again and vandalizing his home. She was released on June 20, 2016, and her bonding evaluation had to be rescheduled.

The next contact S.L.S. had with the Division was on June 23, 2016, when she was hospitalized. After being picked up from the hospital by a caseworker, S.L.S. was encouraged to maintain contact and participate in services. She did contact the Division on July 7, 2016, and was provided with intake information

for Trenton Treatment Center (TTC) relative to substance abuse services commencing on July 22, 2016. When a caseworker picked S.L.S. up on July 18, 2016 for her bonding evaluation, she was at the crisis center, "rolling around on the ground with her arms raised, as security guards were trying to restrain her." In the Division's van, S.L.S. was behaving recklessly by removing I.X.W. from his car seat while the vehicle was in motion, and throwing the car seat towards the front of the van, narrowly missing the caseworker. After exiting the vehicle, S.L.S., who appeared intoxicated, "grabbed and twisted the child's arms."

The bonding evaluation with Dr. David Brandwein had to be terminated early because S.L.S. was "handling [I.X.W.] roughly, banged his head on the furniture, nearly fell on him, yelled, and spanked [I.X.W.] because he was crying while she tried to dress him." As the baby became distressed, S.L.S. "nodded out." Dr. Brandwein had to call security, while S.L.S. tried to break a window after the baby was removed from her. She refused to leave and was arrested.

Dr. Brandwein opined that there was "no parental relationship" between S.L.S. and I.X.W., and it was highly unlikely that the baby would suffer any grief if the relationship was severed. The expert further testified that S.L.S. had "no propensity or ability to soothe [I.X.W.] and her behavior exacerbated [his] distress." Specifically, he stated that, "[i]n this examiner's experience, which

includes thousands of evaluations in child welfare and/or child custody matters, [S.L.S.] is among the most unfit parents this examiner has ever encountered. Placing [I.X.W.] and/or any child in her care would be socially irresponsible and bordering on criminal."

After conducting a bonding evaluation with A.W. and D.W., Dr. Brandwein concluded that a positive bond developed with I.X.W., and they were committed to adopting him at that time.

After missing another substance abuse evaluation, S.L.S. was arrested for armed robbery on August 4, 2016, and cutting a woman in the temple with a knife during the process.[3] The guardianship trial commenced on August 22, 2016, and both parents agreed to surrender their parental rights to A.W. and D.W. On October 28, 2016, due to I.X.W.'s excessive crying, A.W. and D.W. asked that he be removed from their home, and the request was granted. The baby was placed with new resource parents, S.H. and L.H. Because the adoption fell through, the trial court reopened the case on February 10, 2017, reinstated P.W.'s visitation, and ordered that S.L.S.'s visits remain suspended until she signed releases and produced positive collateral references. That day, S.L.S. was admitted to Integrity House for medication monitoring, substance abuse,

---

[3] The charge was later downgraded to attempted robbery of a cell phone.

and mental health treatment. Her program attendance was sporadic, and she continued to struggle with anger outbursts, irritability, and "up and down" emotions.

Dr. Brandwein conducted a bonding evaluation with S.H. and L.H. on June 6, 2017, and reported that I.X.W. "laughed and played with [the new resource parents] referring to them as 'mommy' and 'mapa.'" The expert coined their parenting skills as "flawless," and they expressed a desire to adopt I.X.W. Another evaluation of S.L.S. was conducted by Dr. Brandwein on July 10, 2017, and she admitted that "[t]his substance abuse[,] combined with lasting depression[,] is the reason [S.L.S.] stated she was homeless from the time [I.X.W.] was born until she entered Integrity House . . . ." She also claimed that her father physically abused her, and she could not stay sober outside of a facility. Her criminal history consisted of over forty arrests. During her interview with Dr. Brandwein, she acknowledged her "substance-related behavior," "anxiety," "avoidant and melancholic personality patterns." Dr. Brandwein stated that he "does not see [S.L.S.] as a parental figure" and it is strongly recommended that I.X.W. not have any further visits or contact with S.L.S. as a result of her "extreme levels of personal and psychological instability that have characterized her adult life." He added that "her past abuse and

10

substance-related behavior, serious and significant mental illness, and her poor compliance with treatment suggest[s] a rather high probability for relapse and psychological impairment when [S.L.S] returns to outpatient care." In conclusion, Dr. Brandwein opined that "[S.L.S.'s] capacity for independent parenting of her son is severely lacking" and exposes I.X.W. to "grave risk of physical and/or psychological harm."

On August 12, 2017, the trial court denied S.L.S. visitation because no expert supported same. After completing treatment at Integrity House, S.L.S. was transferred to Hendrick House until December 1, 2017. A counselor there determined that her mental health issues vaulted her addiction problems, that she was "defensive and antisocial, unstable, and that the program had exhausted all its options." On January 23, 2018, she was arrested for a parole violation and she remained incarcerated until the guardianship trial.

A caseworker, Dr. Brandwein, and S.L.S. testified during the two-day trial. Judge Wayne J. Forrest issued a thirty-eight page decision terminating S.L.S.'s parental rights and awarding guardianship of I.X.W. to the Division. The judge found Dr. Brandwein to be a credible witness, and S.L.S. to be incredulous in asserting she could change and parent I.X.W.

A-3159-17T4

Expert testimony established that removal from his current resource parents would cause I.X.W. serious and enduring harm, while termination of S.L.S.'s parental rights would cause I.X.W. no harm.

In his written opinion, Judge Forrest reviewed the evidence presented and stated that:

> Based on [S.L.S's] failure to obtain stable housing, remediate her substance abuse and mental health issues, correct her wayward and criminal behavior and have a permanent plan in place for her son's well[-]being, [I.X.W.'s] safety, health or development have been and would continue to be endangered by a parental relationship with [S.L.S.].

Judge Forrest concluded that: (1) the Division had proven prongs two, three, and four of the best interests test by clear and convincing evidence, N.J.S.A. 30:4C-15.1(a); and (2) termination of S.L.S.'s parental rights was in I.X.W.'s best interest. Judge Forrest focused on S.L.S.'s extensive drug history, frequent incarcerations, failure to complete recommended programs, lack of stable employment, and I.X.W. being in foster care since birth as compelling reasons to terminate her parental rights. He emphasized "[i]t would not be fair to place a child in an environment where there most certainly will be instability and lack of permanency, which is the environment that [I.X.W.] would be placed in if he was returned to [S.L.S.'s] care." He further noted that she "has been

12

afforded numerous opportunities to remediate the obstacles preventing her from reunifying with her son," and she did not take advantage of programs. Instead, she continued to abuse drugs, act violently and erratically with Division staff, and commit crimes. The judge's analysis was correct.

Defendant argues that she made periodic improvements, as documented by her therapists and evaluators, to support her claim that "within a year or two I will be able to provide all the things the resource parent[s] [are] providing for my son, as well." The judge addressed her periodic improvements in his opinion, but noted:

> The only significant length of time that [S.L.S.] has remained sober throughout the pendency of the FN and FG litigation has been for eight months at Integrity House. Integrity House, however, is a controlled, residential environment and according to the Division's evidence and Dr. Brandwein's testimony, [S.L.S.] has not exhibited an extensive length of sobriety outside of a controlled setting.

In N.J. Div. of Youth and Fam. Servs. v. A.R., 405 N.J Super. 418, 437 (App. Div. 2009), this court held that: "Concern and efforts by a natural parent after his or her child has been removed from the home, and making genuine and successful efforts to overcome the cause of the removal is of enormous significance." Here, the harm has not been eliminated by S.L.S. and we reject her argument.

Our review of Judge Forrest's decision is limited. We defer to his expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 413 (1998), and we are bound by his factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citation omitted).

S.L.S. did not proffer any evidence she poses no harm to I.X.W. Expert testimony clearly established that she would be unable to care for I.X.W., and that he had paramount need for a permanent home with capable parents. For the reasons stated by Judge Forrest, we agree that termination of S.L.S.'s parental rights is in I.X.W.'s best interest.

"Inability to provide a stable and protective home" for children is highly relevant to whether a parent "can cease to inflict harm" on them. N.J. Div. of Youth and Family Servs. v. C.S., 367 N.J. Super. 76, 117, 118 (App. Div. 2004). Further, a key issue is whether the parent "can become fit to assume the parental role within time to meet the child's needs." N.J. Div. of Youth and Family Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012) (internal citations omitted).

S.L.S.'s continuing failure to provide I.X.W. with housing and her psychological inability to parent him, harmed I.X.W. by causing him to remain in foster care for several years. See N.J. Div. of Youth and Family Servs. v.

R.G., 217 N.J. 527, 556-57 (2014) (citation omitted). S.L.S.'s other arguments do not warrant further discussion. R. 2:11-3(e)(1)(E).

After reviewing the record, we conclude that Judge Forrest's factual findings are fully supported by the record and, in light of those facts, his legal conclusions are unassailable for the reasons that the judge expressed in his thoughtful opinion.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION