# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3585-18T4
A-3586-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.H. and J.A.L.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.M.L.H.
and J.L., JR.,

     Minors.

_____

Submitted May 18, 2020 - Decided June 17, 2020

Before Judges Rothstadt and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0048-18.

Joseph E. Krakora, Public Defender, attorney for appellant A.H. (Robyn A. Veasey, Deputy Public Defender, of counsel; Dianne Glenn, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant J.A.L. (Robyn A. Veasey, Deputy Public Defender, of counsel; Caitlin Avis Mc Laughlin, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor C.M.L.H. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Danielle Ruiz, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor J.A.L., Jr. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

In these consolidated appeals, A.H. (Amy)[1] and J.A.L. (Jim) appeal from an April 8, 2019 order terminating their parental rights to their two children and awarding the Division of Child Protection and Permanency (the Division) guardianship over both children. On appeal, Jim argues that the Division failed

---

[1] Fictitious names are used to protect the privacy of the parties and the confidentiality of the record. See R. 1:38-3(d)(12).

to satisfy each prong of the best interests test, N.J.S.A. 30:4C-15.1(a), while Amy contests only the judge's findings with respect to the part of prong three that concerns the Division's efforts to reunite the family. Amy also argues that the trial judge abused his discretion in denying her request for an adjournment after she expressed dissatisfaction with her assigned attorney on the first day of trial. We affirm substantially for the reasons given by the trial judge.

## I.

This case involves two children, C.M.L.H. (Cindy), born in 2012, and J.L., Jr., (John), born in 2014. Cindy and John have been placed together with resource parents since January 2017.

The Division became involved with this family in March 2014. Amy was eighteen years old, and Jim was thirty years old. They were living at Jim's father's home with Cindy, and Amy was about three months pregnant with John. The Division received a report from Amy's probation officer that Amy tested positive for heroin, so it implemented a safety protection plan (SPP), requiring Amy and Cindy to move in with Amy's mother and sister. During Amy's incarceration for her probation violation, she spoke with a caseworker and agreed to attend a substance abuse program, other than a Mommy and Me

program. Soon after, the Division dropped the SPP and arranged for Amy's mother and sister to care for Cindy.

The Division arranged for Amy and Jim to attend substance abuse evaluations, and both were recommended for an intensive outpatient program (IOP). Amy was required to attend Women in Recovery Now at Preferred Behavioral Health, which also provided parenting education and transportation assistance, and Jim was referred to Seashore Family Services (SFS) and provided with bus passes. Caseworker Jenise Williams continued home visits, reminding the parents to attend their IOPs and urging them to reach out to Women, Infants, and Children, NJ FamilyCare, and Ocean Health Initiatives.

By June 2014, Amy moved back to Jim's father's home, and she eventually stopped attending her program. When the caseworker visited the home, after Jim tested positive for buprenorphine and THC, Amy and Jim agreed to attend intakes at SFS, remain substance free while caring for Cindy, and maintain a home free from substance abuse. During another home visit, Amy informed the caseworker that Jim did not want to attend SFS because he was "having issues with some of the participants," so she instructed Amy to have Jim discuss the issue with his counselor. Jim stopped attending SFS and was discharged, but soon after, he began a new IOP at Ocean Mental Health (OMH) and obtained a

4

prescription for Suboxone. Amy continued attending SFS and was recommended for a level one outpatient program in October 2014. She successfully completed the program in March 2015, but the Division remained concerned about the family, as Jim stopped taking his Suboxone for a while, stopped attending OMH, and relapsed on cocaine and benzodiazepines.

In addition to the above, the Division assisted the family by providing a toddler bed and a crib, ensuring the parents had proper supplies and information about caring for their children, and transporting the parents to the Board of Social Services (BOSS) and to their programs.

The caseworker continued home visits and noted that the children appeared to be doing well, but there were issues regarding the children's dental health. Amy and Jim delayed taking Cindy to the dentist to address her bottle rot, so multiple appointments were needed to repair her teeth, and she eventually needed to have her teeth removed. By December 2015, the caseworker noted that John's teeth appeared to have "slight[] bottle rot," and when Amy and Jim finally brought him to the dentist in May 2016, the dentist diagnosed him with dental disease.

Meanwhile, the family moved around for several months, raising concerns about the stability of the home. The Division offered to pay for a security

deposit if Amy and Jim identified a place to rent, as long as Jim was able to pay the rent. The caseworker also instructed the parents to place their names on a waiting list for low-income housing and to reach out to BOSS and local churches. In February 2016, the family moved to a motel, and while Jim earned enough to afford rent, he had not attended another substance abuse evaluation, inhibiting the Division from assisting with a security deposit. Around the same time, Jim's doctor stopped prescribing Suboxone because he continued to ask for extensions on his prescription and reschedule appointments. A few months later Jim finally attended an evaluation and was referred for partial hospitalization.

During May 2016 home visits, the caseworker found the family's home to be in a deplorable condition, noting dirty sheets and dog feces lying around. Thereafter, Amy tested positive for morphine, and Jim tested positive for buprenorphine and opiates. The Division implemented another SPP, requiring Amy to move to her grandmother's home, both parents to be supervised with the children, and the children to attend daycare. The family relocated accordingly, but a home visit revealed that Amy had been left alone with the children.

In July 2016, a court order was issued, granting the Division care and supervision of Cindy and John and requiring Amy and Jim to comply with the

SPP, follow up with the children's health appointments, and cooperate with all services recommended by the Division. The Division referred them to Family Preservation Services (FPS), "a short-term intensive, in-home family education and crisis intervention program with the primary objective of prevention of out-of-home placement by enhancing family functioning and problem solving." While Amy and Jim showed some improvement in parenting and household management skills, their cooperation fluctuated, and their compliance was minimal. Additionally, they initially refused to send the children to daycare and only agreed to for a short time, after the FPS worker convinced them to comply.

Meanwhile, Amy began an IOP at SFS in August 2016, but she was discharged in December after she stopped attending. Jim also failed to complete the programs he was ordered to attend at OMH earlier in the year.

On October 14, 2016, Amy met with David R. Brandwein, Psy.D, for a psychological evaluation. Dr. Brandwein found that Amy "lacked insight related to her parenting deficits and minimized and rationalized the Division's concerns about her substance use and parenting capacity." She "failed to understand the impact of missed medical and other appointments on her children's physical health and developmental progression." Dr. Brandwein diagnosed Amy with unspecified opioid-related disorder, unspecified

adjustment disorder, histrionic personality patterns, and borderline intellectual functioning. He recommended that Amy complete a substance abuse treatment program, aftercare, random urine screening, and FPS services; complete an IOP; maintain sobriety for three months; and participate in short-term in-home therapy.

The following months showed no improvement, as Jim continued to miss substance abuse evaluations and test positive for amphetamines and buprenorphine. He also refused to meet with Dr. Brandwein. Amy tested positive for morphine and amphetamines and was referred to SFS but she was discharged for failure to attend. The most notable concern was a neighbor's report to the Division in January 2017 that one of the children drowned the family kitten in a bathtub after they were left unsupervised, prompting the Division to conduct an emergency removal of the children. Thereafter, the Division was granted custody of the children, and it placed them in a non-relative resource home. Cindy and John were enrolled in daycare and scheduled for medical and dental examinations and neurodevelopmental evaluations, which revealed that Cindy had vision and hearing problems, and John had hearing, dental, and speech problems. Appropriate treatments were arranged.

Amy and Jim continued to show no signs of improvement. After Amy reported a domestic violence incident between the two, she was referred to domestic violence counseling and Jim to a domestic violence offenders program, but neither of them attended. They were both incarcerated multiple times, and when they were not, they were, at best, minimally compliant with drug screenings, substance abuse evaluations, and counseling programs that the Division scheduled. Further, their attendance at visitations was sporadic, prompting the judge to suspend visitation until therapeutic visitation was arranged. Neither parent met with the counselor, so their therapeutic visitation slot was closed. The Division re-referred them, and they were placed on a waiting list. Amy and Jim did not see Cindy and John for several months.

The Division struggled to stay in contact with the parents for months. When the caseworker learned that they were not doing well and had no place to stay, she recommended that they stay at a shelter, but they declined. A couple weeks later, they visited the local Division office, and the caseworker told them they still had time to regain custody of their children if they made an effort to comply with the recommended programs. Amy agreed, and she and Jim submitted to drug screenings. Amy tested positive for cocaine and buprenorphine, and Jim for THC and buprenorphine.

Thereafter, the Division informed the parents that they needed to comply with the recommendations, as it was considering transferring the case to the adoption unit. By early 2018, the parents made no progress, so the judge approved a permanency plan, and the Division filed a verified complaint for guardianship and assigned an adoption caseworker, Sandra Weber.

The family began therapeutic visitation, but visits were not consistent. Additionally problematic was the parents' positive drug screenings during some of the visits. Amy began an IOP at Daytop New Jersey but she her attendance was sporadic, and she was ultimately discharged with a recommendation for a higher level of care. In August, she was referred to OMH and began treatment a month later. Jim was also referred for another IOP, but he failed to attend.

Meanwhile, Dr. Brandwein remained involved with the family. On June 4, 2018, he completed another psychological evaluation of Amy, which revealed largely the same issues. He altered Amy's diagnosis to severe opioid use disorder, severe amphetamine use disorder, adult antisocial behavior, and victim of spouse or partner violence, while finding that the previous diagnoses of histrionic personality patterns and borderline intellectual functioning were accurate. Ultimately, he opined "that there has been no substantive change in [Amy's] psychological functioning and parenting capacity relative to the

10

previous examination, and . . . [Amy is not] currently [able] to provide independent care to her children." Because of her limited compliance with services and continued substance abuse, "the likelihood for [Amy] to be capable of independent care of her children in the foreseeable future is quite dismal." He recommended that the Division proceed with a permanency plan for the children "other than reunification . . . with [Amy]."

On July 20, 2018, Dr. Brandwein conducted a bonding evaluation of the family. For thirty minutes, he observed Amy and Jim together with both children, noting that the children were happy to see their parents and referred to them as "mommy" and "daddy." He then observed each parent alone with the children for twenty minutes, noting that both parents were appropriate with the children, but there were some concerns: John had a difficult time separating from Amy, "a sign of insecure attachment in a child his age;" and Jim "seemed overly focused [on] how [John] was different during the observations than he [had] been during parent-child visits," demonstrating a lack of flexibility in accommodate differences in a child's behavior.

Based on his observations, he opined "that while the children do appear to be bonded to their birth parents, . . . [their] bond with them is insecure." He attributed this "to [Amy's and Jim's] long-term behavioral and emotional

instability as well as their absence from the children's lives at different points . . . due to their substance use, substance-related behavior, and repeated arrests and incarcerations." Insecure bonds "are unable to support either child throughout the remainder of their childhood and into adolescence and adulthood." Accordingly, he recommended that the children be allowed to "develop[] a relationship with adult caregivers committed to [their] permanency." The children would be most harmed by continuing to delay permanency "to allow their birth parents to do something they seem poorly motivated to achieve; that is, sobriety, stability, and the development of a lifestyle conducive to raising minor children."

In September 2018, Cindy and John were moved to a new resource home, as the original resource family did not wish to adopt them. On November 10, 2018, Dr. Brandwein conducted a bonding evaluation of the children with the new resource family, and he concluded that the children were "in the process of developing positive, supportive relationships with [the resource parents]." Further, he opined that the children's need for permanency was urgent, and adoption was the best option to meet their needs.

The guardianship trial was held before Judge James M. Blaney on February 27, February 28, and April 8, 2019. At the start of trial, neither Amy

nor Jim was present, but Amy finally arrived and stayed for a short period, leaving the room during much of Dr. Brandwein's testimony.

Dr. Brandwein testified as to each his evaluations. When asked whether his opinions would change if he knew that Amy had been doing well with her treatment since December 2018, he opined that "non-compliance and further drug use [were] more likely than compliance of sobriety" because any recent compliance would only be based on behavior from a two-month period. He also explained that even if the current resource parents did not adopt the children, his opinions would not change because the real concerns were about Amy's and Jim's abilities to care for their children.

During Dr. Brandwein's testimony, Amy requested an adjournment, stating she was dissatisfied with her attorney. The judge denied her request:

> Ma'am, your attorney has been representing you and will continue to represent you. You have the ability to hire your own attorney if you wish, but quite frankly you haven't even been present in this hearing for more than ten minutes and we've been going for over a half-hour. So I find it hard to understand even why you would even think that Ms. Kelly is not doing what she's supposed to be doing. She is, in this [c]ourt's opinion.

Thereafter, Amy left the courthouse. The judge denied her attorney's request for an adjournment, as there was no prior indication that Amy was dissatisfied

13

with her attorney; however, he did request that one of the caseworkers return the following day to allow Amy time to hire a new attorney if she wished.

The trial continued, and the judge heard testimony from Williams and Weber, the Division caseworkers. At the end of the second day, the judge decided to leave the record open to allow Amy additional time to hire a private attorney and decide if she wanted to testify. On March 6, 2019, the judge issued an order requiring the Division to notify Amy and Jim "of their absolute right to present testimony and or evidence on their own behalf to the [c]ourt."

On April 8, 2019, Amy and Jim both appeared before Judge Blaney. Amy testified that she was presently involved with Justice Involved Services and attending an IOP at OMH. Three weeks earlier, she moved into a two-bedroom home with a friend nearby, and a week earlier, she began working at a hotel in Seaside. In addition, she continued to visit the children every other week.

Jim testified that he was incarcerated in Ocean County but would soon be released and had a job lined up. He had been attending visitations with Amy and was most consistent when he was not incarcerated. He acknowledged there had been "starts and stops with various services," explaining that homelessness, job loss, and changing court orders caused his noncompliance.

After hearing from Amy and Jim, the judge issued an oral decision, considering the four prongs of N.J.S.A. 30:4C-15.1(a).  Under prong one, he found that "the children were in significant danger from both parents," as the parents were consistently noncompliant with the Division's recommendations and court orders, and they continued using illicit substances and engaging in "[c]riminal, improper, and assaultive behaviors."  They also failed to meet the children's medical needs and could not provide stable housing.  Under prong two, the judge found that "the children will suffer further delay if permanent placement is not resolved," given the parents' demonstrated lack of interest, their inability to address their substance abuse problems, their failure to meet the children's medical needs, and their repeated incarceration.  He also relied on Dr. Brandwein's opinion that the prognosis for either parent becoming able to independently care for their children was dismal.  Under prong three, the judge found that the Division provided reasonable services, kept both parents updated throughout the case, explored kinship legal guardianship, and ruled out any of the parents' relatives.  Finally, under prong four, the judge relied on Dr. Brandwein's opinion that the resource parents "had forged a loving and caring relationship with the two children . . . and would be able to provide a safe and stable home for . . . them into the future."

15

Based on his findings, the judge terminated Amy's and Jim's parental rights to Cindy and John and awarded the Division guardianship over both children. This appeal ensued.

On appeal, Amy raises the following points:

[1.] THE TRIAL COURT ERRED IN FINDING THAT [THE DIVISION] MET ITS BURDEN OF PROOF BY CLEAR AND CONVINCING EVIDENCE ON ALL FOUR PRONGS OF THE BEST INTEREST TEST PURSUANT TO N.J.S.A. 30:4C-15.1(a) BECAUSE [THE DIVISION'S] EVIDENCE WAS INSUFFICIENT ON PRONG THREE AS [IT] FAILED TO PROVIDE REASONABLE EFFORTS TO EFFECTUATE REUNIFICATION.

[2.] THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED AN ADJOURNMENT OF THE TRIAL AFTER [AMY] EXPRESSED DISSATISFACTION WITH CURRENT ASSIGNED COUNSEL AND WANTED TO RETAIN ANOTHER ATTORNEY.

Jim raises the following points:

[1.] THE DIVISION FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT CINDY AND JOHN'S HEALTH AND DEVELOPMENT HAD BEEN OR WILL CONTINUE TO BE ENDANGERED BY THE CONTINUATION OF THE PARENTAL RELATIONSHIP WITH [JIM].

[2.] THE DIVISION FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT [JIM] IS UNWILLING OR UNABLE TO ELIMINATE THE HARM FACING THE CHILDREN OR IS UNABLE

16

OR UNWILLING TO PROVIDE A SAFE AND STABLE HOME FOR HIS CHILDREN.

[3.] THE DIVISION FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT IT MADE REASONABLE EFFORTS TO PROVIDE SERVICES TO ASSIST [JIM] CORRECT THE CIRCUMSTANCES WHICH LED TO THE CHILDREN['S] REMOVAL.

[4.] THE COURT BELOW ERRED IN FINDING THAT TERMINATION WOULD DO MORE HAR[M] THAN GOOD AND THE DIVISION FAILED TO SHOW THAT A DELAY OF PERMANENT PLACEMENT WOULD CAUSE OR ADD TO THE HARM.

## II.

N.J.S.A. 30:4C-15.1(a) authorizes the Division to petition for termination of parental rights in the "best interests of the child," if it can show the following:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the

17

circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). "We will not disturb the [judge's] decision to terminate parental rights when there is substantial credible evidence in the record to support the [judge's] findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

A.

Jim argues that the trial judge erred when he found clear and convincing evidence that prong one was satisfied, as there was no substantiation of neglect and no evidence of harm to the children, the family lived with the children's grandparents a majority of the time, Jim worked twelve-hour days to pay for the housing, and both parents complied with court orders to have the children immunized and to arrange for the children's dental work. Additionally, Jim contends that the judge erred in relying on Dr. Brandwein's testimony that the

parents did not appreciate the importance of dental hygiene because Dr. Brandwein is not a dental expert, and he did not formally evaluate Jim.

Prong one focuses "on the effect of harms arising from the parent-child relationship over time on the child's health and development." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). The harm "must be one that threatens the child's health and will likely have continuing deleterious effects on the child." Id. at 352. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of DMH, 161 N.J. 365, 383 (1999). The standard is "whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986)).

The record supports the judge's finding that Jim posed a significant threat of harm to Cindy and John. Jim repeatedly failed to comply with court orders and the Division's recommendations and instead continued to use illicit substances and engage in criminal behavior, resulting in his incarceration several times. Additionally, he could not maintain stable housing and was homeless at times. Although Jim points to instances of positive behavior and

relies on a lack of substantiation of neglect, his continued noncompliance with orders and recommendations and his failure to provide a safe, stable home for Cindy and John demonstrate that it was unlikely he would be able to cease any future harm to the children. Additionally, Jim's contention that the judge erred in relying on Dr. Brandwein's testimony about the general importance of dental hygiene is without merit, as a person need not have specialized knowledge to understand the issue generally. See N.J.R.E. 702.[2]

B.

Jim argues that the trial judge erred when he found clear and convincing evidence that prong two was satisfied because he was willing and able to address the Division's concerns, as revealed by his attendance at substance abuse screenings, evaluations and treatment programs, a bonding evaluation, and visitations. Poor attendance with respect to the substance abuse evaluations was due to his work schedule. Further, Jim asserts he was able to provide safe housing, and he continued working to ensure he was able to pay for housing.

---

[2] N.J.R.E. 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

Lastly, Jim disputes the credibility of Dr. Brandwein's opinion that the children's bond to Jim was insecure, as he claims it was based solely on his incarceration.

Under prong two, the Division must show that the parent is unable or unwilling to correct the circumstances that led to the Division's involvement. K.H.O., 161 N.J. at 348-49. There must be continued harm to the child, resulting from the parent's inability or unwillingness to remove or overcome the harm. N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012). "Parental unfitness may . . . be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay [of] permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). "Keeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

The record supports the judge's finding that the children would continue to suffer harm from a delay in permanent placement. There is substantial evidence that Jim repeatedly failed to comply with the Division's recommendations regarding his substance abuse problems, and he was repeatedly incarcerated, both of which affected his ability to meet the children's needs. Moreover, Dr. Brandwein testified that the prognosis for Jim's ability to

21

acquire the skills necessary to independently care for the children was dismal. Any reliance by Dr. Brandwein or the trial judge on Jim's incarceration was not error, as judges may properly consider a parent's incarceration in combination with other factors, such as parental performance before incarceration, whether a need for permanency will be undermined by a continued parent-child relationship, and the effect of a continued relationship on the child's psychological and emotional well-being. In re Adoption of Children by L.A.S., 134 N.J. 127, 143-44 (1993).

In addition, we reject Jim's contention that Dr. Brandwein's opinion with respect to Jim was unreliable. Although Dr. Brandwein did not complete a psychological evaluation of Jim, he reviewed several documents in connection with his evaluation of Amy, which provided information about Jim, and he observed Jim's behavior during the bonding evaluation. While Dr. Brandwein's opinion of Jim was based on less information than his opinion of Amy, he explained why he opined that Jim had not overcome the issues that harmed Cindy and John and why he would likely be unable to do so in the foreseeable future. See Townsend v. Pierre, 221 N.J. 36, 54 (2015) ("[N.J.R.E. 703] requires that an expert 'give the why and wherefore' that supports the opinion, 'rather than

22

a mere conclusion.'" (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013))).

C.

Amy and Jim both argued that the trial judge erred when he found clear and convincing evidence that prong three was satisfied. Amy contends that the services the Division provided were not reasonable and did not assist in reunifying her with Cindy and John. Specifically, she asserts that the Division failed to recommend an inpatient Mommy and Me program and domestic violence counseling, and it failed to provide sufficient housing assistance, as it only offered a housing voucher contingent upon Jim attending a substance abuse evaluation. Additionally, Amy argues that the Division should have provided supervised visitation with the children at a local Division office when she and Jim were on the waitlist for therapeutic visitation.

Jim admits that the Division provided certain services and explains that he participated and received positive feedback. However, he claims that the Division did not provide housing assistance, and he contends that a parent's poverty cannot be the sole reason that a child is removed from his or her parents. He adds that the Division did not always properly notify him of recommended services, and it did not schedule them around his work schedule.

Under prong three, the Division must make reasonable efforts to promote family reunification and to provide "assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." K.H.O., 161 N.J. at 354. Efforts include, but are not limited to,

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

The reasonableness of the Division's efforts "must be [determined] on an individualized basis," DMH, 161 N.J. at 390, and are not evaluated based on their success, id. at 393.

The record supports the judge's finding that the Division provided reasonable services to both parents. Amy and Jim's arguments are without merit. The Division scheduled numerous substance abuse evaluations, which led to referrals for IOPs. If the programs did not provide transportation, the Division arranged for it. The Division also arranged for psychological evaluations, a

bonding evaluation, visitations, and FPS, and it recommended a Mommy and Me program for Amy and domestic violence programs for both parents. Additionally, throughout the entire case, the Division tried to communicate with the parents as often as it could. When Amy and Jim were dissatisfied with their programs, the caseworker expressed the importance of continuing the programs. She also updated them on the progress of the case and, after the emergency removal, also on the children's progress.

Amy and Jim have not identified any additional services that would have impacted their abilities to overcome their substance abuse problems and parenting deficiencies. That they were unsuccessful in completing or complying with the required programs does not bear upon the reasonableness of the Division's efforts. See ibid. The record reveals that the Division provided both parents with many opportunities to address the Division's concerns.

D.

Jim argues that the trial judge erred when he found clear and convincing evidence that prong four was satisfied because he should not have relied on Dr. Brandwein's testimony, as it was not based on a psychological evaluation. The bonding evaluation revealing no evidence of Jim hurting the children, and Dr. Brandwein admitted that there was a psychological bond between Jim and the

children, unlike their relationship with the resource parents. Further, there was no evidence that the current resource parents wished to adopt the children.

Prong four requires the judge to balance the child's relationship with their biological and resource parents and then determine whether the children will suffer greater harm from the termination of ties with the former than with the latter. K.H.O., 161 N.J. at 355. To terminate parental rights, the judge need not find "that no harm will befall the child as a result of the severing of biological ties." Ibid. Instead, the judge must focus on "the child's age, [his or] her overall health and development, and the realistic likelihood that the [biological] parent will be capable of caring for the child in the near future." Id. at 357.

"The overriding consideration . . . remains the child's need for permanency and stability." L.J.D., 428 N.J. Super. at 491-92. "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 453 (2012). "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

The record supports the judge's finding that termination of Jim's parental rights would not do more harm than good. As we explained under prong two, Dr. Brandwein's testimony about the children's insecure attachment to Jim was appropriate. In contrast with his opinion of Jim's parenting abilities, Dr. Brandwein noted no concerns about the resource parents' abilities to provide a safe and stable environment for Cindy and John. The judge relied on Dr. Brandwein's opinion that the resource parents "had forged a loving and caring relationship with the two children . . . and would be able to provide a safe and stable home for . . . them into the future." Both children have a need for permanency, and as Dr. Brandwein opined, after years of noncompliance with services, there is no evidence to suggest that Jim will be able to maintain sobriety long enough to avoid continuing to endanger both children. Allowing another family to adopt Cindy and John serves their best interests, as it will give them the permanency they need.

### III.

Amy contends that the trial judge erred in denying her request for an adjournment to retain a private attorney, thereby depriving her of a fair trial.

We review the denial of an adjournment request to hire a private attorney for an abuse of discretion and will reverse only if the denial caused the

requesting party to suffer a "manifest wrong or injury." State v. Hayes, 205 N.J. 522, 537 (2011) (quoting State v. McLaughlin, 310 N.J. Super. 242, 259 (App. Div. 1998)). In termination of parental rights cases, parents have a right to be represented by an attorney. N.J.S.A. 30:4C-15.4(a); N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 305-06 (2007). In criminal cases, our Supreme Court has identified several factors that judges should balance against the right to an attorney when deciding whether to grant an adjournment to allow a party to retain a new attorney:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.
>
> [Hayes, 205 N.J. at 538 (quoting State v. Furguson, 198 N.J. Super. 395, 402 (App Div. 1985)).]

We conclude that the judge did not abuse his discretion in denying Amy's request for an adjournment. Amy did not express dissatisfaction with her attorney until first day of trial, during Dr. Brandwein's testimony. Further, she did not provide the judge with any reason for her dissatisfaction. After Amy left the courtroom, her attorney stated that Amy's present dissatisfaction had not hampered their ability to communicate previously. The judge provided Amy with ample time to hire a private attorney by arranging for Weber to testify the following day and leaving the record open for over a month. Alternatively, as the judge found, nothing in the record suggests that Amy's attorney's performance was deficient and that a different attorney would have accomplished a different result.

To the extent we have not addressed any of the parties' remaining arguments, we find that they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3585-18T4