# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0066-25

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.T.,

     Defendant-Appellant,

and

J.R. (identified surrender on
May 28, 2025),

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF I.C.T.,
a minor.

_____

Argued May 20, 2026 – Decided June 15, 2026

Before Judges Gummer and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0015-25.

Ryan T. Clark, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ryan T. Clark, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Neha Gogate, Assistant Deputy Public Defender, argued the cause for minor (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, of counsel and on the brief).

PER CURIAM

Defendant K.T. (Kate) appeals from the Family Part's August 20, 2025 judgment terminating her parental rights to her biological son, I.C.T. (Ian).[1] Asserting the Division of Child Protection and Permanency (the Division) failed to make reasonable efforts to obtain for her services provided by the Division of Developmental Disabilities (DDD), Kate argues the trial court erred in finding the Division had established the third prong of the best-interests test, N.J.S.A.

---

[1] We refer to the parties, child, and resource parents involved in this case using either initials or pseudonyms to protect their privacy and the confidentiality of these proceedings. R. 1:38-3(d)(12).

2

30:4C-15.1(a)(3). Kate also argues the court erred in finding the Division had proven termination of her rights would not do more harm than good under prong four of the test, N.J.S.A. 30:4C-15.1(a)(4). The Division and Ian's law guardian contend the judgment is supported by substantial credible evidence in the record and should be affirmed. Having reviewed the record in light of the parties' contentions and the applicable law, we affirm.

I.

Kate and J.R. (Jerry) are the biological parents of Ian, who was born in December 2022. They are also the biological parents of three other children: the oldest born in 2019 and twins born in 2020. Kate's parental rights as to those three children were previously involuntarily terminated. Jerry surrendered his parental rights to all four children. This appeal addresses the termination of Kate's parental rights as to Ian.

After receiving a report from the Camden Police Department in October 2023, the Division conducted an emergency removal of Ian and placed him with M.M. (Martha) and C.M. (Charles), who had adopted the twins earlier that year. Ian has resided with Martha and Charles since then. At trial, Martha testified about the couple's desire to adopt Ian.

3                                                    A-0066-25

After multiple compliance-review and case-management conferences, the Division filed a complaint on January 6, 2025, for guardianship of Ian, seeking to terminate Kate's parental rights under Title 30. Given that filing, the court terminated the pending proceedings in a January 13, 2025 order.

At the guardianship trial, which occurred later that year, the Division presented the testimony of Division caseworker Dawn Hoyle, Martha, and Dr. James Loving, Psy.D., a psychologist with expertise in clinical and forensic psychology. Kate presented the testimony of Division caseworker Kelly Lezan.

Dr. Loving testified about his March 2025 psychological evaluation of Kate and bonding evaluations between Ian and Kate and Ian and his resource parents, Martha and Charles. Based on those evaluations, he supported the Division's goal of Martha and Charles adopting Ian. Kate did not present any expert testimony disputing Dr. Loving's findings or opinions.

During her interview, Kate informed Dr. Loving she was living in her childhood home with her parents, planned to continue living there, and was receiving Social Security Disability Insurance payments but did not know for what underlying condition. Kate was pregnant at the time of her interview. She had disclosed her pregnancy to the Division before the interview. However, when Dr. Loving asked about the pregnancy, she denied she was pregnant. Dr.

A-0066-25

Loving found her denial significant because it raised concerns about her ability to properly care for the new baby. Dr. Loving described Kate's scores in prior IQ testing as "extremely low."

Dr. Loving diagnosed Kate with "Intellectual Disability (moderate)," meaning she had "significant intellectual and functional limitations." He also gave "a rule-out diagnosis of major depressive disorder" because Kate had "described pretty significant depressive symptoms" in previous evaluations but he could not confirm if she continued to experience those symptoms based on her limited responses. According to Dr. Loving, depression "magnifies the risk for neglect."

He rendered the following opinions in his written psychological evaluation of Kate:

> [Kate] presents with serious parenting-related risks, which unfortunately prevent her from providing a safe home to [Ian]. She has lifelong intellectual and functional limitations, which by their nature will not significantly change or improve now that she is an adult. Of course, these concerns brought [the Division] at the births of her oldest three children and contributed to [the Division] taking custody. Despite her involvement with visitation and services over a span of years, [Kate] continues to lack a basic ability to understand and meet her son's needs. I feel compelled to make the same point quoted . . . [in a] 2021 evaluation report. That is, most parents with intellectual limitations are capable of providing safe

5

and adequate care to their children, especially if they have reliable and effective supports around them. Unfortunately, [Kate's] level of intellectual functioning is extremely low, so that it would not be accurate to equate her to many other parents for [whom] this description applies. Making matters worse, she has a limited support system, and based on records, the family members who are part of her household have been hampered by similar limitations.

In [Kate's] case, her intellectual and parenting limitations are significant enough that they would prevent her from safe reunification, even if no other risk factors were in place. Sadly, there are also other risk factors that are also barriers to safety. This includes a pattern of suddenly angry and aggressive behavior on her part, despite an otherwise docile demeanor. [Kate] is a usually cooperative and well-meaning young woman, but in moments when she feels overcome with strong emotions, she has the capacity to lash out in unpredictable and dangerous ways . . . includ[ing] examples when she has become aggressive toward her children or toward other people while her children are present. Importantly, these examples all took place even during time-limited supervised visits. If [Kate] were to regain custody of [Ian], she is capable of suddenly-angry and aggressive behavior toward or in front of him. Despite her best intentions, she poses a high risk for physically hurting or emotionally traumatizing her son.

. . . .

[I]t is my sad but strong opinion that [Kate] will not be able to provide a safe, healthy home to [Ian] – certainly not within the foreseeable future, not even in the longer-term unless she connects with someone reliable and healthy enough to live with her and

6

A-0066-25

co-parent on a full-time basis. Even then, she would almost certainly be unsafe for unsupervised parenting time, except on a time-limited basis.

Even if [Kate] were afforded more time to work toward reunification, I would not be able to recommend any new or different services to help overcome her parenting risks. . . . Over the years, she has participated in basic but appropriate services that would have helped most parents overcome their risks. Unfortunately, in her case, these risks are largely rooted in intellectual and functional limitations that will not change substantially over time.

Dr. Loving also found Kate could not be relied on to protect Ian, if necessary, from Jerry, whom Dr. Loving described as "a registered sex offender, prohibited from having any unsupervised contact with children."

Dr. Loving confirmed those opinions in his trial testimony. He acknowledged Kate was able to change Ian's diapers but expressed concern about her ability to recognize and respond to the child's other needs, act in an emergency, meet Ian's needs as he grew older, talk to doctors about medication or treatment, and address his educational requirements. Dr. Loving was "extremely concerned" about Kate's ability "to keep up and manage the basics." He discerned no "roadmap to [Kate] safely regaining custody" and described Kate's prognosis for parenting "[v]ery poor." He opined that "any parenting services would not have a good chance of making parenting safe in this

7

situation" and there were no services "that would remedy [Kate's] parenting deficits."

Regarding the bonding evaluations, Dr. Loving found Ian had "a positive but fairly weak attachment to [Kate]." In contrast, Dr. Loving determined Ian "had formed fairly strong and positive attachments" to Martha and Charles. (Emphasis omitted). He believed that if Kate's parental rights were terminated, Ian would face "a fairly low risk for emotional harm" and that Martha and Charles were capable of mitigating any harm, noting they already were meeting Ian's needs. Dr. Loving opined Ian would suffer developmental harm if returned to Kate's care. He concluded terminating Kate's parental rights "would not cause [Ian] more harm than good" but "[i]nstead . . . would give him the best chance to enjoy a safe, healthy, and permanent home."

Martha testified about Ian's condition and behavior when the Division first placed him with her and Charles. She described the care she and Charles were providing to Ian and the physical and speech therapy, developmental intervention, and medical treatment he was receiving. She also explained why she and Charles wanted to adopt Ian.

Hoyle testified about the history of the Division's involvement with Kate and her interactions with Kate. She described the circumstances surrounding

8

A-0066-25

Ian's removal and the condition of the home. She testified about the services the Division had provided and attempted to obtain and provide to Kate. She described the Division's efforts and her personal efforts in this and prior litigation to obtain DDD services for Kate.

Lezan testified about her interactions with Kate, concerns about Kate having cognitive impairment or developmental delays, and her efforts to help Kate, including efforts to assist Kate in obtaining DDD services.

On August 20, 2025, the court rendered an oral decision, finding credible the testimony of the witnesses and holding the Division had proven by clear and convincing evidence each prong of the best-interests test of N.J.S.A. 30:4C-15.1(a). The court entered a judgment that day terminating Kate's parental rights and awarding the Division guardianship of Ian.

This appeal followed.

## II.

The termination of parents' rights to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Those rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or

A-0066-25

psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012).

"Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have acknowledged "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

Consequently, the law requires a balancing of those two competing interests: the parents' constitutionally-protected right to raise their children, absent state interference, and the State's responsibility to protect the welfare of children. N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 20 (2023). That balancing "is achieved through the best interests of the child standard." Ibid. (quoting K.H.O., 161 N.J. at 347). The Legislature codified that standard in N.J.S.A. 30:4C-15.1(a). See D.C.A., 256 N.J. at 21 (recognizing

A-0066-25

the Legislature codified "the best[-]interests test" when it enacted N.J.S.A. 30:4C-15.1(a)).

Thus, when seeking termination of parental rights, the Division must establish, by clear and convincing evidence, the following four-prong criteria set forth in N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

See N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 612 (1986) (applying the clear-and-convincing standard in a parental-rights termination case). These four prongs "are not discrete and separate" but rather "overlap to offer a full picture of the child's best interests." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014).

A-0066-25

We give substantial deference to the trial court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. Id. at 552. "Our general deference on appeal is also informed by the Family Part judge's 'feel of the case[,]'" N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family[,]" F.M., 211 N.J. at 448. Accordingly, we defer to the trial court's factual findings "and uphold those findings if they are grounded in substantial and credible evidence in the record." D.C.A., 256 N.J. at 19. The trial court's decision should be reversed on appeal only if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)); see also N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023). We review the trial court's legal conclusions de novo. R.G., 217 N.J. at 552-53; see also D.C.A., 256 N.J. at 19 (acknowledging we give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

Guided by those principles, we consider Kate's appeal. She does not contest the court's findings under the first or second prongs of the best-interests

A-0066-25

test.  She challenges only the court's findings under the third and fourth prongs of the test.

Prong three, N.J.S.A. 30:4C-15.1(a)(3), requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights."  The reasonableness of the Division's efforts is not conditioned on their success.  N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012).  The success or failure of the Division's efforts will "not foreclose a finding that the Division met its statutory burden to try to reunify the children with the family."  Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007)).  "Experience tells us that even [the Division]'s best efforts may not be sufficient to salvage a parental relationship."  F.M., 211 N.J. at 452.  As to the second part of the third prong, the Division must "prove by clear and convincing evidence that 'alternatives to termination of parental rights' have been appropriately considered."  N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013) (quoting N.J.S.A. 30:4C-15.1(a)(3)).

A-0066-25

Prong four, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. In making that determination under the fourth prong, the court may consider evidence regarding the bond between the child and the resource parents. See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best[-]interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

Kate argues the court erred in finding the Division had proven the first part of the third prong, contending the Division violated N.J.S.A. 9:6-8.58(b) by not making reasonable efforts to consult with DDD and thereby failed under N.J.S.A. 30:4C-15.1(a)(3) to make reasonable efforts to provide services to Kate to help her correct the circumstances leading to Ian's placement with resource parents.

A-0066-25

The Legislature amended N.J.S.A. 9:6-8.58 by adding paragraph (b). The amendment was effective April 30, 2025, nearly four months after the Division filed the guardianship complaint under Title 30 and about four months before the court entered judgment terminating Kate's parental rights to Ian. The amended statute provides:

> Provision for therapeutic services.
>
> a. In cases where, in the opinion of the court, an individual found to have abused or neglected a child appears to be in need of therapeutic services, the court may order the individual to accept such services or evaluation for such services, including, but not limited to, homemaker services, functional education, group self-help programs, and professional therapy; provided, however, that the court may not commit any person to any residential mental health facility without the consent of such person or after a hearing held pursuant to the requirements of R.S. 30:4-23 et seq. The court shall determine the ability to pay and the method of payment for the care, as it orders.
>
> b. In cases where an individual described in subsection a. of this section has a developmental disability as defined in section 3 of P.L.1977, c. 82 (C.30:6D-3), and is eligible for services provided by [DDD] in the Department of Human Services:
>
> (1) the Division . . . shall make reasonable efforts to consult with [DDD] to create an appropriate plan for services for the individual that takes into consideration the individual's disability; and

(2) [DDD] shall determine an appropriate method to offer the services based on the individual's disability.

[(Emphasis added).]

Kate did not raise with the trial court the amended statute or the Division's purported violation of it. The court nevertheless considered the efforts the Division had made with DDD when it addressed prong three of the best-interests test in its oral decision. The court detailed the "litany of services" the Division had provided to Kate and found the Division had made "[m]ore than reasonable efforts to provide services." The court also determined the services provided "address[ed] many of the functioning activities that are referenced in the DDD guide." The court outlined the specific efforts the Division had made regarding DDD and found the Division had provided "[s]ome assistance with the DDD application and follow-up." The court determined the Division "should have helped [Kate] more" with respect to DDD, but it did not find the efforts it had made to consult with DDD were unreasonable or otherwise a violation of N.J.S.A. 9:6-8.58(b). Moreover, the court concluded that even if the Division had done more to help Kate obtain DDD services, "the services would not have made a difference" because:

[Kate] doesn't have the capacity to understand the needs of her son, who is two years, eight months old, provide him a safe and stable environment . . . unless there is

16

A-0066-25

24/7 supervision, which there is no indication[] DDD is going to wave that magic wand and . . . that's going to be available. She is not able to safely parent and be reunified with . . . [Ian].

Those factual findings are supported by substantial credible evidence in the record.

When it amended N.J.S.A. 9:6-8.58, the Legislature did not amend N.J.S.A. 30:4C-15.1(a)(3). Thus, the Legislature did not limit the consideration of the reasonableness of the Division's efforts under the third prong of the best-interests test to one type of service. It did not amend Title 30 to provide that an imperfect effort to consult with DDD equated with a failure to "ma[k]e reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" under N.J.S.A. 30:4C-15.1(a)(3).

In D.C.A., 256 N.J. at 27-28, the Supreme Court declined to apply to the fourth prong of the best-interests test, N.J.S.A. 30:4C-15.1(a)(4), a legislative amendment to the second prong of the test, N.J.S.A. 30:4C-15.1(a)(2). The Court held:

In L. 2021, c. 154, which amended no fewer than eight statutes the Legislature could easily have barred evidence of a child's relationship with resource parents in a court's inquiry under the fourth prong of the statutory standard, or entirely precluded consideration

of such evidence in any aspect of a court's inquiry. Because the Legislature did not amend any provision of the statute other than N.J.S.A. 30:4C-15.1(a)(2), we discern no legislative intent for so fundamental a change. . . . Were we to infer such intent absent a clear indication from the Legislature, we would undermine the state's parens patriae obligation to protect the welfare of children. . . . Such a ruling would deprive a court of crucial information as it determines a child's future and could imperil children whom New Jersey is charged to protect.

[Ibid. (citations omitted).]

We reach the same conclusion here and discern in the amendment to N.J.S.A. 9:6-8.58 no legislative intent to amend N.J.S.A. 30:4C-15.1(a)(3). In determining whether the Division had proven the first part of prong three, the court appropriately considered the totality of the circumstances, including the services provided, the efforts to provide services, and the nonexistence of any services that would have enabled Kate to safely parent Ian. The court determined overall that the efforts made by the Division, though imperfect, were reasonable. We perceive no legal or factual basis to disturb that conclusion.

The court found the Division had proven the second part of the third prong, having demonstrated no reasonable alternatives to the termination of parental rights existed, as "the record is clear, [and] the factual and expert testimony [establish] that [Kate] is unable to provide a safe and stable home for

18

[Ian] independently now or in the foreseeable future, even with . . . additional services." Challenging that holding, Kate does not cite any record evidence that assistance from DDD would have enabled her to safely parent Ian. Instead, she contends the Division failed to prove the second part of the third prong because it "did not meaningfully pursue . . . a DDD-supported reunification structure" as a "permanency alternative to termination." As with her argument under the first part of prong three, Kate premises that argument on the amendment to N.J.S.A. 9:6-8.58. For the same reasons we reject that argument as to the first part of prong three, we are unconvinced by it as to the second part of prong three.

Kate also challenges the court's finding under prong four. In determining whether the Division had proven prong four, the court considered all the evidence in the record, including evidence regarding positive aspects of the interactions between Kate and Ian and Dr. Loving's opinions and testimony, which the court found credible and which were undisputed by any expert witness presented by Kate. The court concluded the Division had established the termination of Kate's parental rights would not do more harm than good. That conclusion is supported by substantial credible evidence in the record.

Finally, we note that at oral argument, Kate's counsel asserted Kate had successfully parented Ian for the first ten months of his life, which counsel

described as the most difficult time in a child's life for a parent. Even accepting as true that description of early infancy, we cannot accept counsel's characterization of Kate as a successful parent. That characterization is directly contrary to the evidence in the record and the findings of the trial court under the first and second prongs of the best-interests test, which were supported by substantial credible evidence and were not challenged by Kate in this appeal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division